951 So.2d 384 (2007)
STATE of Louisiana
v.
Brandon KING.
No. 06-KA-554.
Court of Appeal of Louisiana, Fifth Circuit.
January 16, 2007.
*387 John M. Crum, Jr., District Attorney, Rodney A. Brignac, Assistant District Attorney, Edgard, Louisiana, for Plaintiff/Appellee.
Prentice L. White, Louisiana Appellate Project, Baton Rouge, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., FREDERICKA HOMBERG WICKER, and GREG GERARD GUIDRY.
FREDERICKA HOMBERG WICKER, Judge.
Defendant, Brandon King, appeals his conviction and sentence for manslaughter, a violation of La. R.S. 14:31. Defendant and co-defendant, Corey Williams, were charged by grand jury indictment with the first degree murder of Carol Hunt. Defendant entered a plea of not guilty at his arraignment. The State later amended the indictment, reducing the charge to second degree murder, La. R.S. 14:30.1. Defendant was arraigned on the amended charge and pled not guilty. Defendant was tried separately by a jury on February 23, 24 and 25, 2005, and was found guilty of the lesser included offense of manslaughter, La. R.S. 14:31. Defendant filed a motion for new trial, and the district court denied it. He was then sentenced to serve thirty years at hard labor without benefit of parole, probation, or suspension of sentence. This timely appeal follows.
FACTS
On the afternoon of August 5, 2002, fifteen-year-old Corey Williams met the seventeen-year-old defendant near Williams' home in the Park Place Subdivision in Laplace. Defendant's grandmother lived in that neighborhood, although defendant's own home was in the area of Laplace known as Milesville. Williams testified that he and defendant walked to the adjacent Laplace public housing development to obtain a car. Upon failing to get *388 the car they sought, they walked through the middle of the complex. The victim, Carol Hunt, drove past them twice in a black sports car. When she passed a third time, defendant flagged her down. Ms. Hunt told them she wanted to buy crack cocaine. Williams testified he had met Ms. Hunt on previous occasions, and he had sold her drugs. Defendant was also acquainted with her.
According to Williams, defendant had some "rocks" in a clear plastic wrapper from a cigarette package. Defendant gave one of the rocks to Ms. Hunt. She tasted it, said it was not real, and attempted to give it back to defendant. Defendant pulled out a gun. Williams testified he had seen defendant with the weapon several times in the past, but he did not know defendant was armed that day. Ms. Hunt grabbed defendant's gun while she attempted to drive away, and a shot was fired. Williams said the victim's car kept going until it ran into a nearby house. He and defendant fled on foot. Williams testified that he saw defendant's former girlfriend, Kelli Kliebert, at the scene with members of her family at the time of the shooting.
Williams testified he met defendant that night at the home of Jimmy Creecy, defendant's cousin. Williams and defendant agreed that, if questioned by police, they would say they were in Milesville at the time of the shooting. On the following morning defendant asked Williams to take his gun and hide it, and Williams complied. Williams was taken to the detective bureau two days after the shooting, and was interviewed by Detective Kenneth Mitchell of the St. John the Baptist Parish Sheriffs Office.
Detective Mitchell testified he was assigned to supervise the investigation of Ms. Hunt's death. He arrived at the scene at about five o'clock on the afternoon of August 5, 2002, to find the victim dead in the driver's seat of her car. He observed a bullet hole that went through her left arm and into her chest. There were two twenty-dollar bills on the driver's side floorboard of the car.
Detective Mitchell testified he attended the victim's autopsy, which was performed by Dr. Susan Garcia. He learned a projectile had entered the victim's arm and her left side, piercing a lung, the liver, and the heart. Dr. Garcia removed the projectile from the victim's body and turned it over to crime scene technician Michael Davis.
Detective Mitchell testified that his investigation led him to 165 Joe Parquet Circle, fifteen-year-old Kellie Kliebert's home address. The residence was near the scene of the shooting. At the detective's request, Ms. Kliebert met with him on August 6, 2002. at the detective bureau. Ms. Kliebert told Detective Mitchell that at the time of the shooting, she was carrying shopping bags from her family's vehicle into their residence. She saw defendant and Williams down the street near the victim's car. While she was inside, she heard a noise that sounded like breaking glass. When she went back outside, she saw the victim's car resting between buildings. Ms. Kliebert told the detective she walked to the car and saw the victim had been shot. Ms. Kliebert's police statement was played for the jury during Detective Mitchell's testimony.
In her trial testimony, Ms. Kliebert again indicated she heard the shooting, but did not see it. She only saw defendant and Williams approach the victim's car. Ms. Kliebert testified that defendant telephoned her on the night of the shooting, and she told him the victim was dead. She said she received a second telephone call from defendant, during which he accused her of ratting him out. Ms. Kliebert testified *389 that she's known defendant to have a gun, but that she did not see him with one on the day of the shooting.
Detective Mitchell testified he interviewed defendant on August 6, 2002. Defendant told him he happened upon Corey Williams while Williams was selling narcotics to the victim. Defendant said Williams asked him to stop, so defendant stayed there and waited. According to defendant, Williams told the victim, "Give it up." Then defendant heard a gunshot, and he and Williams ran away. Detective Mitchell testified that defendant reported Kellie Kliebert had seen the shooting. In a second statement, defendant told the detective the weapon used in the shooting was located at Keva Duronslet's residence. Detective Mitchell testified the weapon was found in the place defendant described.
Patrick Lane of the Louisiana State Police Crime Lab was accepted by the court as an expert in the field of forensic science. Mr. Lane testified at trial that the projectile recovered from the victim was fired from the weapon recovered at Ms. Duronslet's residence.
Eric Smith testified he was a fellow inmate of defendant's at the St. John the Baptist Parish jail two to three years prior to trial. He heard defendant singing and "rapping" one night with some other inmates. Smith testified that defendant said, "I bust a cap in these bitches head and the bitch ran out, I knew she was dead." Smith also heard defendant say, "`I shot the bitch and I got away across the ditch.'"
Defendant testified at trial that he was with Corey Williams during the early morning on August 5, 2002. He next saw Williams that evening while walking in the housing project. Defendant said he saw Williams flag down the victim in her car. When defendant passed him, Williams asked where he was going. Defendant replied that he was going to his house in Milesville. Williams asked defendant to wait for him. Defendant testified that while he waited for Williams, he saw Kellie and Chris Kleibert down the street. While he tried to get their attention, he heard a gunshot. He asked Williams why he had shot the victim, and Williams told him she should have "upped it." Defendant testified that after the shooting he went to Milesville and Williams ran through the project carrying the gun.
Defendant testified he next saw Williams thirty minutes later at Jimmy Creecy's house. Williams informed him everyone was saying he (defendant) had shot the victim. Defendant testified he did not give Williams a gun to hide for him, and that he informed police where Williams had hidden the weapon. At trial, defendant denied having any prior knowledge that Williams would attempt to sell narcotics to the victim.
Chris Kliebert, Kellie's brother, testified for the defense at trial. He said he saw Williams and defendant standing near a car down the street from his house. Kliebert called out to defendant and walked towards him. He heard a small noise that sounded like "pow," and then he saw Williams and defendant running. Kliebert testified he saw a gun in Williams' hand.
Jimmy Creecy, another defense witness, characterized Williams as a "thug" who sold marijuana and crack cocaine, and burglarized houses. He further testified that Williams carried a gun, and that the gun recovered at Duronslet's residence was the one he had seen in Williams' possession. Creecy said that when Williams arrived at his house on the night of the shooting, he appeared nervous. Williams repeatedly peered out the windows and asked whether there were any police around. According *390 to Creecy, Williams said, "`Dude, I f* * *ed up, you know. What I'm going to do? I f* * *ed up.'" Carl James testified he was at Creecy's house on the day of the shooting, and he heard Williams say something like "`I F'ed up.'" When called by the State on rebuttal, Detective Mitchell testified Carl James told him Williams did not, in his presence, say that he "f* * *ed up."
LAW
Defendant assigns four errors on appeal. We will first consider defendant's second claim, that the evidence at trial was not sufficient to support his manslaughter conviction.[1] The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In cases involving circumstantial evidence, the trial court must instruct the jury that, "`assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.'" La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must "determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt." State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83.
All persons concerned with the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24. Only those persons who "knowingly participate in planning or execution of a crime" are principals to that crime. State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, 428. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. Id. The mental state of one defendant may not be imputed to another defendant. Thus, mere presence at the scene of a crime does not make one a principal to the crime. State v. Coleman, 02-0345 (La.App. 5 Cir. 9/18/02), 829 So.2d 468, 471. It is, nonetheless, "`sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention.'" State v. Anderson, 97-1301 (La.2/6/98), 707 So.2d 1223, 1225.
Defendant was charged with second degree murder, but was convicted of manslaughter, a violation of La. R.S. 14:31. While R.S. 14:31 A sets forth two possible theories of manslaughter, the trial court instructed the jury only as to that section's second subpart, which provides, in pertinent part:
A. Manslaughter is:
(2) A homicide committed, without an intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not *391 enumerated in Article 30 [first degree murder] or 30.1 [second degree murder], or of any intentional misdemeanor directly affecting the person; or. . . . . . . . .
Specifically, the court instructed the jury that they could find defendant guilty of the lesser offense of manslaughter if they found the State had proved that defendant killed Carol Hunt; and that the killing took place while defendant was engaged in distribution or attempted distribution of cocaine or counterfeit cocaine.
Defendant argues the evidence showed he was merely present at the scene at the time of the shooting. He contends a rational trier of fact could not have found guilt beyond a reasonable doubt based on the self-serving testimony of his co-defendant, Corey Williams, and the biased testimony of defendant's former girlfriend, Kellie Kliebert. Therefore, defendant argues, the jury's finding constitutes manifest error. We find no merit to defendant's argument.
The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier-of-fact, who may accept or rejectin whole or in partthe testimony of any witness. State v. Baker, 01-1397 (La. App. 5 Cir. 4/30/02), 816 So.2d 363, 365. It is not the function of the appellate court to second-guess the credibility of witnesses as determined by the trier-of-fact or to reweigh the evidence absent impingement on the fundamental due process of law. Id. A Jackson sufficiency review does not require the court to determine whether it believes the evidence at trial established guilt beyond a reasonable doubt. State v. Barnes, 98-932 (La.App. 5 Cir. 2/10/99), 729 So.2d 44, 46, writ denied, 99-1018 (La.9/17/99), 747 So.2d 1099. Rather, the reviewing court, considering the record as a whole, must determine whether any rational trier-of-fact would have found guilt beyond a reasonable doubt. Id.
Williams and defendant laid the blame for the shooting on each other. Defendant claimed complete innocence in the matter, and Williams admitted his participation. Williams testified he had pled guilty to manslaughter and was serving a ten-year sentence. He said he agreed to testify at defendant's trial as part of a plea agreement.
The jury obviously found the testimony of Williams and other State witnesses more credible than that of the defense witnesses. We find that under the Jackson standard, a rational trier-of-fact could have found defendant was guilty beyond a reasonable doubt.
In his first assignment of error, defendant complains the trial court violated his Sixth Amendment right to a fair trial by curtailing his efforts to evaluate prospective jurors' understanding of the concept of "mere presence" during voir dire.
An accused has a constitutional right to a full and complete voir dire examination. La. Const. art. I, § 17. Nevertheless, the scope of voir dire lies within the sound discretion of the trial court, and its rulings will not be disturbed by the reviewing court absent clear abuse of that discretion. State v. Roy, 95-0638 (La.10/4/96), 681 So.2d 1230, cert. denied, 520 U.S. 1188, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997); State v. Francis, 95-194 (La. App. 5 Cir. 11/28/95), 665 So.2d 596, 601.
While limitations on voir dire may not be so restrictive as to deprive counsel of a reasonable opportunity to determine grounds for challenges for cause and for the intelligent exercise of peremptory challenges, an appellate court should review the voir dire as a whole in deciding whether *392 the defendant has been afforded sufficient latitude in examining potential jurors. State v. Hamilton, 92-1919 (La.9/5/96), 681 So.2d 1217, 1222, cert. denied, 520 U.S. 1216, 117 S.Ct. 1705, 137 L.Ed.2d 830 (1997).
On the first day of defendant's trial, during his voir dire examination of the first panel of prospective jurors, defense counsel told them, in pertinent part:
One of the laws that the State talked to you about was the law of principals. And they correctly said that all persons involved in the commission of a crime can be charged with the commission of that crime. All persons involved.
Also in that statute is a sentence that they didn't tell you about. And the sentence says that mere presence, mere presence at the scene of a crime, mere presence at the scene of a crime is not sufficient to convict a person of a crime.
The prosecutor objected, and argued at side-bar that defense counsel had misstated the law of principals. The prosecutor asked the trial judge to so admonish the prospective jurors. The judge denied the State's request, but said she would order defense counsel's explanation stricken from the record. Counsel asked the judge when he would be allowed to refer to the concept of "mere presence," and the judge said she would not allow him to do so until after she had researched the matter. Counsel objected to the court's ruling, and asked for time to apply for supervisory writs. The judge responded, "You'll have to send somebody, we're not stopping here."
When the side-bar discussion concluded, the judge told the prospective jurors to "disregard the last statement of Mr. Belfield [defense counsel] regarding the mere presence at the scene." Defense counsel moved for a mistrial, and the judge denied it. Counsel continued his voir dire examination with the following example:
In terms of principals, all persons involved in the commission of a crime. You're at the bank cashing your paycheck over at the Hibernia Bank. Somebody that you know comes in and robs the bank. You're standing at the teller line. They reach over you and point a gun at the teller and take the money from the teller and run out the bank. In order for you, who's cashing your check, to be a principal in the crime of bank robbery the State of Louisiana has got to present to you evidence that you weren't there just cashing your check, you had some involvement in the planning and the commission of the bank robbery. Do each of you understand that?
(Affirmative response)
If the State of Louisiana gives you the facts as I've just given them to you, that you were there, that's not sufficient. Simply being there is not sufficient. Do each of you understand that?
Principals involve an act of doing something towards the furtherance of the crime. You understand that? You planned it, you drove the getaway car, you were the lookout, you were peeping out the door to see if the police were coming. You weren't there simply at the counter cashing your check. Do each of you understand that? Do each of you have, any, any of you have a problem with that concept? Just wasn't there.
(No response)
Later in the proceedings, after prospective jurors were removed from the courtroom, defense counsel again argued defendant's right to discuss the concept of "mere presence" before prospective jurors. The trial judge responded that counsel had amply explained the concept when he gave *393 prospective jurors the bank robbery example. She told counsel, "So I've made my ruling, you can follow-up on it if you want to but we're going to move on." Counsel again moved for a mistrial, and the judge denied the motion.
Jury selection continued on the second day of trial, at which time defense counsel filed a written motion for reconsideration of the court's ruling barring the defense from questioning jurors regarding the concept of "mere presence" at the scene of a crime. The trial judge denied counsel's motion to reconsider her ruling, explaining that he had been given an opportunity to explain to prospective jurors what he meant by "mere presence." Defense counsel objected, and again moved for a mistrial. The trial court denied the motion.
When the second panel of prospective jurors was called, both the prosecutor and defense counsel explained the law of principals to them, noting that the State was required to prove more than the fact that a person was at the scene of a crime in order for him to be considered a principal. To the third panel of prospective jurors, the prosecutor again explained the law of principals, stating that just because someone is present at the scene of a crime does not mean he is guilty of the crime; that the person must be involved in some way. Defense counsel told the panel the State was required to show "more than a person being just there at the scene of the crime."
A review of the voir dire as a whole shows no abuse of discretion by the trial court. The judge gave defense counsel sufficient latitude to ensure the prospective jurors were fully informed of the law of principals. The judge limited counsel's examination only to the extent necessary to ensure that he did not pass on an incorrect statement of the law to the prospective jurors. Additionally, the record shows that the trial court charged the jury as to the law of principals. The court instructed the jury, in part, that "[m]ere presence at the scene of the crime does not . . . make one a principal. Mere knowledge of a co-perpetrator's intent is not sufficient to make one a principal." Based on the foregoing, defendant's first assignment of error has no merit.
In his third assignment of error, defendant complains the trial court erred in denying his motion for mistrial during the testimony of Patrick Lane, the State's expert in the field of forensic science. Defendant maintains that Lane's comments regarding his practice of preparing duplicate DNA swabs made available for testing by both the State and defense implied to the jury that defendant had the burden of proving his own innocence.
During cross-examination by defense counsel, Lane testified he creates DNA samples by running two sterile cotton swabs on the surface of the object being tested. In this case, the object was the alleged murder weapon. Lane explained, "The purpose of that is to allow one to be consumed by the laboratory and to have a second available for defense if they wish to conduct their own examination."
Defense counsel subsequently asked Lane whether it was possible that DNA evidence could be contained on one swab and not the second one, and Lane responded in the negative. The following exchange ensued between defense counsel and the witness:
Q. The only way that we could be sure would be to test both the swabs. We'd be absolutely sure then, right?
A. I would not argue with you that by testing the other one you would answer the other part of that question.
Q. And that didn't happen in this case, both swabs were never tested?

*394 A. Your swab
Q. To the best of your, to the best
A. Your swab is still
Q. Not mine
A.waiting for you.
. . . .
Q. First of all, did I ask you to do a swab? You said just now my swab. Did I ask you to do a swab? It's a yes or no, yes or no answer. Did I ask you to do a swab?
A. No, you didn't.
During redirect examination, the prosecutor asked Lane what he meant when he referred to the second DNA sample as "your swab." Defense counsel approached the bench and argued Lane should not be allowed to imply that defendant had a duty to examine the second swab and present evidence. The prosecutor responded that the jury needed to know the purpose for which the second swab was prepared; that the State did not purposefully neglect to have the swab tested. Defense counsel commented that he had discontinued that line of questioning with Lane because he knew the witness was on "shaky ground." Counsel moved for a mistrial.
The trial judge told the attorneys she recognized Lane's comments implied there was a second swab that someone did not test. She discussed with them ways in which the situation might be rectified. Defense counsel again argued he was entitled to a mistrial. Finally, the judge told the prosecutor he would be allowed to ask Lane what he meant when he said "your swab." She first instructed Lane out of the jury's hearing that he was not to mention defendant in his response to that question. This exchange between the prosecutor and Lane followed:
Q. Please answer the question.
A. Okay. The way that our laboratory protocol is set up we must maintain half of the sample in the event that someone may, they may or may not choose to use it but we have to maintain it, and that's what we did.
Q. If somebody wants to test it?
A. If they do or if they don't. I mean, the requirement for us is
Q. It's there either way?
A. Sure.
Defense counsel objected and moved for a mistrial. The trial judge denied the motion. Defense counsel requested time to apply for supervisory writs, and the judge denied the request.
Mistrial is a drastic remedy, and is warranted only where remarks result in substantial prejudice sufficient to deprive the defendant of a fair trial. State v. Overton, 618 So.2d 439, 441 (La.App. 5 Cir.1993). A determination of whether prejudice has resulted lies within the sound discretion of the trial judge. State v. Smith, 430 So.2d 31, 44 (La.1983). The decision to grant or deny a mistrial is within the sound discretion of the trial court. The denial of a motion for a mistrial will not be reversed on appeal unless the trial court has abused its discretion. State v. Ratcliff, 98-101 (La.App. 5 Cir. 2/23/99), 731 So.2d 356, 363, writ denied, 99-1112 (La.9/3/99), 747 So.2d 541.
The mandatory mistrial provisions of La.C.Cr.P. art. 770 do not apply here, since Lane was not a judge, district attorney, or court official. The provisions of La.C.Cr.P. art. 771 do not apply here either, because neither the State nor defendant requested an admonition. Thus, the authority for a mistrial in this instance would have to come from La.C.Cr.P. art. 775(3), which provides:
A mistrial may be ordered, and in a jury case the jury dismissed, when:

*395 (3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law.
We do not find that the trial court abused its discretion in denying defendant's mistrial motions. Although Lane's objectionable answers were unsolicited and unresponsive, defense counsel did not immediately move for a mistrial. Moreover, it appears defense counsel himself called additional attention to the unwanted responses with his persistent questions to Lane about the two swabs. Instead of moving to another topic, defense counsel continued his line of questioning. In any case, the trial court rectified the matter to a large extent by allowing the prosecutor to elicit testimony from Lane on re-direct examination that the second swab was available for anyone who wished to test it, not just the defense. This assignment of error has no merit.
In his fourth and final assignment of error, defendant argues the trial court erred in denying him a mistrial based on the State's failure to comply with discovery. La.C.Cr.P. art. 729.5 A. Defendant references three pieces of evidence: a tape recording of defendant's interview with Detective Mitchell, scientific analysis reports from the State crime lab, and handwritten notes Detective Mitchell made during his investigation.
Louisiana's criminal discovery rules are intended to eliminate unwarranted prejudice arising from surprise testimony and evidence, to permit the defense to respond to the State's case, and to allow a proper assessment of the strength of the State's case. La.C.Cr.P. arts. 716-729; State v. Brazley, 97-2987 (La.9/25/98), 721 So.2d 841, 842 (per curiam); State v. Williams, 03-942 (La.App. 5 Cir. 1/27/04), 866 So.2d 1003, 1010, writ denied, 04-0450 (La.6/25/04), 876 So.2d 832. When a defendant is lulled into a misapprehension of the strength of the State's case through the State's failure to fully disclose, basic unfairness may result. State v. Brazley, supra.
La.C.Cr.P. art. 718 provides for discovery, on motion of the defendant, of documents and tangible things which are in the possession, custody, or control of the State when the items sought are (1) favorable to the defendant and material and relevant to guilt or punishment, (2) are intended for use by the State as evidence at trial, or (3) were obtained from or belong to the defendant. Id. Discovery is not limited to what is contained in the district attorney's file. Id.; State v. Lee, 531 So.2d 254 (La.1988) (per curiam).
The State's duty to disclose is a continuing one, and if the State discovers additional evidence that may be subject to discovery, or decides to use a particular item as evidence, it must notify the defendant of the existence of the additional evidence and its intended use at trial. La. C.Cr.P. art. 729.3; State v. Ray, 423 So.2d 1116, 1118 (La.1982).
La.C.Cr.P. art. 729.5 sets forth sanctions for failure to comply with discovery requests:
A. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.
*396 The State's failure to comply with discovery procedures does not automatically require reversal. The appellate court must examine the circumstances of the case to determine whether the defendant was prejudiced, and whether any prejudice resulting from the State's non-compliance with discovery procedure caused the trier-of-fact to reach the wrong conclusion. State v. Sweeney, 443 So.2d 522, 527 (La. 1983).
On August 19, 2002, defendant filed a "motion to preserve evidence," requesting that all handwritten notes of investigating officers regarding witness interviews be preserved. The trial judge signed the order the following day.
On September 5, 2002, defendant filed a "motion for bill of particulars discovery and inspection." In item number 26, paragraphs j and k of that motion he requested that the State "disclose all recordings, transcriptions or written summaries of each oral statement" of defendant and produce each written statement of defendant. Defendant asked the State in item number 31 whether any scientific tests had been performed and, if so, to disclose the results.
On November 6, 2002, the State filed an "answer to motion for bill of particulars discovery and inspection." In its combined answer to numbers 20 and 21, the State informed defendant an anonymous person had told Detective Young that suspect number 1 was wearing a white t-shirt and dark pants and was approximately 5 feet, 5 inches tall and weighed approximately 140 to 150 pounds. The State also indicated suspect number 2 was described as wearing a red shirt and black pants and was approximately 5 feet, 6 inches to 5 feet, 7 inches tall and weighed approximately 150 to 160 pounds.
In response to defense request number 26, the State provided a narrative of defendant's statement, and attached a transcript of the statement to the answers. In response to request number 31, the State said it would provide results of scientific tests when they became available. On October 20, 2003, the State filed a "notice of intent to use and introduce a certificate of analysis." Attached to the notice was a crime lab report pertaining to fingerprint processing and firearm analysis completed in connection with the murder investigation. A second such notice was filed on March 8, 2004. Attached to it were lab reports regarding fingerprint and DNA analysis done in connection with the investigation.
At trial defense counsel objected when the prosecutor indicated he would play defendant's tape recorded interview with Detective Mitchell for the jury. Counsel argued he had asked for the tape in discovery, but the State had failed to provide it. The trial judge noted that counsel had a copy of the transcript of the tape recording. Counsel countered that he had a right to listen to the tape to ensure it was consistent with the transcript. Counsel also argued that the tape contained evidence of other crimes. The judge then ordered the objectionable portions of the transcript excised, and the edited tape was played for the jury.
Defense counsel objected at trial when the prosecutor attempted to question Detective Mitchell regarding a scientific analysis report from the state crime lab. Counsel argued he had never seen the report, although he had asked for all such reports in discovery. The prosecutor responded that the document was attached to the "notice of intent to use and introduce a certificate of analysis" the State filed on March 8, 2004. The judge overruled counsel's objection and allowed the document to be admitted in evidence.
*397 Detective Mitchell testified during cross-examination that he interviewed several individuals as part of his investigation, including Jimmy Creecy, Trenise Felton, Carl James, and Myrna Davis. He indicated he did not tape record those interviews, but wrote down the witnesses' responses, compiled them in a single report, and then shredded the original notes of the interviews. During redirect examination, Detective Mitchell explained that each witness' interview was contained in his report regardless of whether the individual gave him information that was favorable or unfavorable to the State.
Defense counsel informed the court he had never received Detective Mitchell's thirty-one page report, and objected when the prosecutor attempted to question the officer about it. The trial judge responded that both attorneys had referred to the report during the course of the trial. When the defense called Detective Mitchell as a witness, he testified he was not aware of the trial court's August 20, 2002 order that all handwritten notes of the investigating officers be preserved.
We do not find that the trial court erred in failing to grant defendant a mistrial based on discovery violations. The record shows defense counsel did not move for a mistrial based on any of the alleged violations, nor did he request a trial continuance in accordance with La.C.Cr.P. art. 729.5. Moreover, defendant does not show he was prejudiced by any discovery failure on the part of the State. Defendant received transcripts of his two recorded statements well in advance of trial, and the tape that was played for the jury was redacted to remove references to other crimes. The record shows defendant also received copies of the lab reports at issue prior to trial. As for Detective Mitchell's notes, it appears defense counsel had possession of the report that was compiled from those notes.
We have reviewed the record for errors patent in accordance with La.C.Cr.P. art. 920, and find that the trial court imposed an illegal sentence. Defendant was sentenced to thirty years at hard labor without benefit of probation or suspension of sentence. However, La. R.S. 14:31 B only provides for restriction of benefits in cases where the victim died as a result of a battery and was under the age of ten. Because that special circumstance does not exist in the facts of this case, the trial court erred in restricting defendant's sentence.
Therefore, we vacate defendant's sentence and remand the matter for re-sentencing in accordance with La. R.S. 14:31 B. See, State ex rel. Roland v. State, 06-0244 (La.9/15/06), 937 So.2d 846 (per curiam).
CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED
NOTES
[1] When the issues on appeal pertain to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La. 1992).