FREDERICKA HOMBERG WICKER, Judge.
|2Pefendant, Quvadirs Ruffin, appeals his convictions arising from events which occurred in the early morning hours of May 28, 2011. In this appeal, defendant argues the evidence was insufficient to support his conviction and that the trial court erred by excluding evidence of a “CODIS” match from trial. For the following reasons, we affirm defendant’s convictions and sentences.

PROCEDURAL HISTORY

On June 24, 2011, the Jefferson Parish District Attorney filed a bill of information charging defendant, Quvadirs R. Ruffin a.k.a. Scooter Ruffin, with possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (Count 1); armed robbery while armed with a firearm in violation of La. R.S. 14:64 (Count 2); aggravated flight from an officer in violation of La. R.S. 14:108.1(0 (Count 3); and resisting a police officer with force or violence in violation of La. R.S. 14:108.2 (Count 4). Defendant was arraigned on June 27, 2011, and pled not Lguilty. On August 10, 2011, defendant’s motions to suppress evidence and statement were denied.
On July 25, 2012, the state entered a nolle prosequi on Counts 3 and 4, and it proceeded to trial on Counts 1 and 2. On July 25 and 26, 2012, the case was tried before a 12-person jury that unanimously found defendant guilty as charged, on both counts.
On August 7, 2012, the state filed a multiple bill alleging defendant had prior felony convictions. Defendant filed a premature motion for reconsideration of sentence on August 22, 2012. The next day, defendant filed a premature pro se motion for appeal that was denied. On September 13, 2012, defendant filed a “Motion for New Trial and Alternatively to Arrest the Judgment.” He filed a response to the multiple bill on October 17, 2012.
On October 18, 2012, the trial judge denied defendant’s “Motion for New Trial and Alternatively to Arrest the Judgment.” After waiving sentencing delays, the trial judge sentenced defendant, on Count 1, to 20 years in the Department of Corrections without benefit of probation, parole, or suspension of sentence, and, on Count 2, to 99 years in the Department of Corrections without benefit of probation, parole, or suspension of sentence. These sentences were ordered to run concurrently. Afterward, defendant asked the trial judge to consider his previously filed motion to reconsider sentence. After doing so, the trial judge denied the motion. On that same date, a multiple bill hearing was held, after which the trial judge found defendant to be a five-time felony offender.
On November 4, 2012, defendant filed another motion for reconsideration of sentence. On January 7, 2013, the trial judge vacated the sentence on Count 2 and re-sentenced defendant under the multiple bill statute to “life imprisonment” without benefit of probation, parole, or suspension of sentence to run concurrently |4with the previously imposed sentence. Defendant filed a timely motion for appeal on January 25, 2013, that was granted.

*333
FACTS

James Rivas testified that he was the manager of Braxton’s Restaurant and Lounge, at 636 Franklin Street in Gretna on May 28, 2011. At 1:30 a.m. Mr. Rivas was at the restaurant, having just closed it, with the porter and dishwasher, Mr. Van Kennedy. Mr. Rivas and Mr. Kennedy were sitting on the restaurant’s front porch facing Rupp Street. Mr. Kennedy went inside the restaurant. Mr. Rivas stayed behind sitting on the bench for a few moments.
While alone on the porch, a man approached Mr. Rivas from the street. The man was wearing gloves, a hat, and a mask that covered the majority of his face. The masked man came up to Mr. Rivas on the porch and told Mr. Rivas to “[gjive me all your ... money, or I’m going to kill you.” The masked man then pushed Mr. Rivas through the front door into the restaurant. Inside, the masked man held a gun to Mr. Rivas’ head and told him to get money out of the restaurant’s cash register. Mr. Rivas complied and gave the masked man four hundred dollars from the cash register. After collecting this money, the masked man forced Mr. Rivas to search for other money in the restaurant. Mr. Rivas and the masked man moved through various rooms in the restaurant and eventually encountered Mr. Kennedy in the kitchen. The masked man grabbed Mr. Kennedy by the collar and put a gun to his head. The masked man then marched Mr. Rivas and Mr. Kennedy out of the kitchen and into the restaurant’s back office. In the office there was a closed safe that contained no money. The masked man forced Mr. Rivas to lie on the ground. He then took the safe from the office and carried it out of the building.
Once Mr. Rivas realized the masked man was no longer in the restaurant, Mr. Rivas went again to the front porch. From that vantage point he saw a car flee l.drom the restaurant. Mr. Rivas did not see the person enter that car, he only saw the car flee the restaurant. Mr. Rivas observed the car, at the first intersection, make a left turn toward Algiers. Mr. Rivas testified that the car he saw flee the restaurant was the same car pictured in the state’s exhibit 18. Mr. Rivas testified that the police were called immediately to report the crime.
At trial, Mr. Rivas testified that the restaurant’s surveillance system captured the crime. The surveillance system’s recording of that night’s robbery was played for the jury.[1] Mr. Rivas identified the man in the surveillance video as the person who robbed him. This video showed the masked man took the safe out of the office at 1:43 a.m.
Mr. Rivas stayed on the porch and waited for the police to arrive. The police found a safe outside the restaurant and Mr. Rivas identified it as the safe that had been taken from the restaurant.
On the question of the masked man’s identity, Mr. Rivas admitted that he could not say defendant was the person who robbed him because he had never seen the face of the person who robbed him. The perpetrator of this crime had at all times covered his face with his mask and hat. Mr. Rivas further testified that, although he could see the eyes of the masked man, he could not tell his race. However, Mr. Rivas testified that the masked man was black “by how he talked.” Mr. Rivas did testify that he remembered the hat worn by the perpetrator as having the name *334 “Harris” written on it. When shown state’s exhibit 20, Mr. Rivas testified that he recognized the hat photographed as the hat which the masked man wore.
Van Kennedy testified next. He confirmed that he was working at the restaurant the night it was robbed. He testified that the robbery occurred sometime | (¡between 1:30 and 2:00 a.m. Mr. Kennedy confirmed that he and Mr. Rivas were sitting outside the restaurant immediately before the robbery but that he had gone inside before the robbery began. Mr. Kennedy was standing in the kitchen, over the fryer, cleaning it, when he was confronted with Mr. Rivas and the perpetrator. Mr. Kennedy testified that the perpetrator grabbed him by the collar, pointed a gun at him, and demanded Mr. Kennedy’s own money. Mr. Kennedy responded that he did not have any money. At that point, the perpetrator forced Mr. Rivas and Mr. Kennedy towards the back office. Mr. Kennedy testified that once the masked man got them into the office, he ordered them to “Lay down face down. And don’t look up, or I’ll kill both of you. I’ll kill y’all.” The two men complied with the perpetrator’s demand.
Mr. Kennedy testified that the perpetrator left them in the back office and took the safe. Once the perpetrator was gone, Mr. Kennedy got up and called 911. He testified that he was scared and probably gave the 911 operator his boss’s name.[2]
Mr. Kennedy testified that he saw defendant “pull off’ from the restaurant “to make a left turn on Franklin Street.” He admitted however that he did not see defendant get into that car. Mr. Kennedy identified the car as a “maroon looking dark colored Chevrolet.” Mr. Kennedy described the car as a newer car with big headlights and round taillights.
On the question of the perpetrator’s identity, Mr. Kennedy testified that the man who robbed them that night had his shirt tied around his face and that the robber was not wearing a mask. Mr. Kennedy described the perpetrator as wearing a gray or black shirt, jeans, gloves, a hat, and having a stocky build. Mr. Kennedy 17testified that he could also tell the perpetrator was black because he could see across his eyes and the bridge of his nose. At trial, Mr. Kennedy testified that he knew defendant was the person who robbed him that night because he recognized the defendant from the portion of his face that was not covered that night.[3]
Captain Jarvis Jackson of the Gretna Police Department was working at Club Secrets a half block away from Braxton’s when he heard on the radio that an armed robbery had occurred there. He looked down the street but could not see anything, so he drove to the scene. When Captain Jackson arrived, he met with Mr. Kennedy, who told him a black “guy” robbed the restaurant. Mr. Kennedy told him that the perpetrator left the scene in a dark-colored car and was headed in a northerly direction on Franklin. Captain Jackson then broadcasted that information over the radio.
*335 Officer Henry Schiro, a reserve officer with the Gretna Police Department, was working that night in a marked patrol unit when he heard that broadcast. Shortly thereafter, Officer Schiro observed a vehicle matching that description traveling on Magellan, the street before Braxton’s, going fast in a westerly direction. Before activating his sirens and giving chase to the vehicle, Officer Schiro was able to get next to the vehicle, and when he did, he saw a black male sitting in the driver’s seat alone in the vehicle. He radioed that information to headquarters. Officer Schi-ro turned around at an intersection to follow the vehicle, and when he did, the vehicle sped off. Officer Schiro activated his lights and sirens and pursued the vehicle. Officer Schiro described his pursuit over the police radio.[4]
| sFrom these radio transmissions, Captain Jackson learned that the vehicle was coming back into Gretna, so he left Brax-ton’s and drove to the center of Franklin Street. While waiting, he saw the vehicle in question traveling at a high rate of speed on Rupp Street, a cross street to Franklin. This vehicle passed right by him. Captain Jackson began pursuing the suspect vehicle and was following directly behind the suspect. Captain Jackson observed that the vehicle failed to stop at several stop signs. The vehicle ended up on a dead-end road, and Captain Jackson saw the brake lights on the vehicle. The vehicle then hit some gravel, and dust and smoke from the gravel popped up. The driver’s side door of the vehicle swung open, and the driver exited the vehicle while the vehicle was still moving. Captain Jackson observed the driver run around the back of the vehicle and discard something. The vehicle subsequently crashed into a fence toward the dead-end, and the driver jumped over the fence and ran. A semiautomatic firearm was later found lying on the ground at the scene where the vehicle crashed.
Describing the crash, Captain Jackson indicated that he saw only one person exit the vehicle. Captain Jackson confirmed that he did not give chase to this person because he wanted to secure the vehicle and “make sure that no one else was inside the vehicle.” Captain Jackson stayed with the vehicle until after the defendant was apprehended. After the driver fled over the fence and into the neighborhood, a perimeter was set up.
Officer Francisco Campos of the Gretna Police Department testified that he, in his own patrol unit, had joined the chase of the vehicle before it crashed at the dead-end. Officer Campos testified that he also observed the crash and the fleeing of one person from the vehicle’s driver’s side. Officer Campos testified that the | ¡¡first time he saw defendant was when defendant fled the vehicle, climbed a fence, and escaped into a neighborhood.
Thereafter, Officer Campos testified that he set up a perimeter in an attempt to apprehend the driver. Officer Campos testified that the next time he saw the driver was when defendant emerged from the same area he had escaped into at Isbell and Perry streets. There, Officer Campos and the driver made eye contact before the driver then fled back into the neighborhood. Officer Campos testified that he saw the driver jump several fences in back yards.
*336 Officers maintained the perimeter and were able to narrow down which back yard the driver went into. Officer Campos subsequently found the driver crouched and hiding underneath a raised pool deck in a back yard on Isbell Street. Officer Campos ordered the driver to come out, and he eventually did so. Officer Campos testified that after a brief fight between him and the driver, the driver surrendered and was placed in handcuffs. At trial, Officer Campos identified the driver of the car that he pursued that night as defendant.
Officer Campos advised defendant of his rights, which he appeared to understand. Defendant then told the officer that he had been kidnapped. He explained that he was in the area to visit friends, and that a dark-colored vehicle pulled up, after which a black male told him to get inside the vehicle. Defendant claimed he complied with his demands because the black male was armed. Defendant also told Officer Campos he did not know who the vehicle belonged to.
Officer Campos testified that defendant’s statement did not match the facts revealed by his investigation. Officer Campos testified that he never saw a second person in the area where the perimeter had been set up. Furthermore, a police dog was used at the scene to attempt to locate a second person, but no one was found. [,(Additionally, Officer Campos later learned that the vehicle from which defendant fled actually belonged to his girlfriend.
Officer Campos testified also that in a search of the car defendant was driving, after defendant’s apprehension, he collected a hat, gloves, and a cloth-type material from inside the vehicle.[5] Officer Campos confirmed that these pieces of evidence were the same pieces of evidence which were subject to DNA testing.
Adriana Perez, an expert forensic DNA analyst, testified that once she obtained a buccal swab from defendant, she compared that reference sample, through DNA testing, to cuttings from a black shirt, a hat and the thumb portion of a glove retrieved from the crime scene.[6] Regarding the comparison to the cutting from the black shirt, Ms. Perez testified that although there was DNA present, there was insufficient DNA to generate a genetic profile for comparison purposes. Regarding the comparison of the hat cutting to defendant’s DNA, Ms. Perez testified that the DNA from the cutting of the hat, was inconsistent with the DNA profile obtained from defendant; however, she explained that the DNA on the hat was from a male relative of defendant. However, she explained that it was not uncommon for a person to wear a garment once and leave little or no DNA behind. Finally, Ms. Perez also testified that the DNA obtained from the glove was consistent with being a mixture from at least three individuals. Ms. Perez testified that defendant could not be excluded as a donor of the DNA in this mixture. Furthermore, while approximately 99.9 percent of the global population could be excluded as a donor in this mixture, all males in defendant’s lineage could not be excluded as a donor of the DNA found.
| nBrittiny Adams, defendant’s girlfriend, testified that on May 27, 2011, she gave *337 defendant $400.00 and loaned him her vehicle, a black Chevy Impala, after which he left to go to Boomtown casino at approximately 8:30 p.m. Regarding what defendant was wearing when he left for the casino, Ms. Adams testified that defendant was wearing blue jean shorts that came to some point between his knees and his ankles. She further testified that she did not have a hat or gloves in her vehicle, and defendant was not wearing a hat or gloves that night. Ms. Adams confirmed that the vehicle photographed in the state’s exhibits was her vehicle. Ms. Adams also testified that, after defendant’s arrest, she retrieved her car from the Gretna police department.
Defendant testified to an alternative version of events. He testified that on May 27, 2011, he left his girlfriend’s residence at about 8:00 p.m. with $400.00 that his girlfriend had given him, and drove his girlfriend’s car, a black Impala, to Boom-town Casino. Defendant stayed at the casino until midnight, and then left with approximately $230.00. When he got within a couple of blocks of his girlfriend’s house, he had car problems so he pulled to the side of the road and activated his hazard lights. Defendant claimed he stayed there for an hour or so waiting for help. At some point, he started the car, after which somebody approached him with a gun. Defendant testified this person demanded that defendant move to the passenger side and then got into the car’s driver’s side. He was unable to tell what the person was wearing or what race he was. The person began driving the car at a high rate of speed, and defendant heard police cars coming behind them.
At some point, the person told defendant to get out of the car while it was still moving, and he complied. Defendant testified that he ran from the point where he exited the car, jumped a fence, and hid under a pool deck because he was |12scared. When he saw the police officers, he felt like it was safe for him to come out. Defendant explained that when he came out with his hands up, he tried to tell the officers he had been carjacked, but the officers beat and kicked him. He denied that he had to be pulled out from under the pool deck. Defendant acknowledged that he sustained injuries and had to go to the hospital. He denied being in possession of a gun that morning. Defendant also denied entering Braxton’s on the morning of May 28, 2011, and he claimed he had never seen or met Mr. Rivas or Mr. Kennedy before.
In support of the state’s charge that defendant was guilty of being a felon in possession of a firearm, the trial court heard testimony from Nikki Passalaqua, an expert in the field of latent print identification, analysis, and comparison. The trial court admitted state’s exhibit two, a ten-fingerprint card Ms. Passalaqua took from defendant the previous morning. The court then admitted into evidence, state’s exhibits three, four, and five. Respectively, these were certified conviction packets showing convictions for: possession of cocaine in Orleans Parish Criminal Court Docket Number 467-69; first degree robbery in Orleans Parish Criminal Court Docket Number 403-947; and simple robbery in Orleans Parish Criminal Court Docket Number 404-051. Each of these packets contained the finger-prints of the person convicted. Ms. Passalaqua testified that defendant’s fingerprints matched the fingerprints for the convictions reflected in state’s exhibits three, four, and five.

DISCUSSION

In his appeal to this Court, defendant assigns two errors. First, defendant argues that the evidence was insufficient to *338 support his conviction.[7] Second, defendant argues the trial court erred when it excluded from evidence at trial, the |13fact that there was a “CODIS hit” indicating that the DNA from a different person, who had committed a prior sex crime, was found on a piece of evidence.

Assignment One

In his first assignment of error, defendant argues the evidence was insufficient for the jury to find that he was the person who committed the armed robbery in question. Defendant was convicted of both one count of armed robbery in violation of La. R.S. 14:64, and one count of being a convicted felon in possession of a firearm in violation of La. R.S. 14:95.1. Defendant’s argument on this appeal however does not directly contest the sufficiency of the evidence to support his conviction for being a felon in possession of a firearm. Moreover, defendant does not argue that the state failed to prove any of the essential statutory elements of his conviction for armed robbery; rather, defendant contends the state failed to prove beyond a reasonable doubt his identity as a perpetrator of the armed robbery. Defendant claims the state failed to negate a reasonable probability that a second person committed the crime and then later kidnapped him.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. King, 06-554 (La.App. 5 Cir. 1/16/07), 951 So.2d 384, 390, writ denied, 07-0371 (La.5/4/07), 956 So.2d 600.
An appellate court’s primary function is not to redetermine the defendant’s guilt or innocence in accordance with its appreciation of the facts and credibility of the witnesses. Rather, our function is to review the evidence in the light most favorable to the prosecution and determine whether there is sufficient evidence to support the jury’s conclusion. State v. Banford, 94-883 (La.App. 5 Cir. 3/15/95), 653 So.2d 671, 677.
Evidence may be direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams, 05-59 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208.
In addition to proving the statutory elements of the charged offense at trial, the state is required to prove defendant’s identity as the perpetrator. State v. Draughn, 05-1825 (La.1/17/07), 950 So.2d 583, 593, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007); State v. Ingram, 04-551 (La.App. 5 Cir. 10/26/04), 888 So.2d 923, 926. Where the key issue is identification, the state is required to negate any reasonable probability of misiden-tification in order to carry its burden of proof. Draughn, 950 So.2d at 593. Positive identification by one witness is suffi *339 cient to support a conviction. State v. Harris, 07-124 (La.App. 5 Cir. 9/25/07), 968 So.2d 187, 193.
The state put forth sufficient evidence that defendant was the person who committed the armed robbery in this matter. The state presented evidence that showed a black male who wore gloves, a cap, and a mask robbed Mr. Rivas and Mr. Kennedy of $400.00 at Braxton’s Restaurant while armed with a gun. Mr. Kennedy identified defendant as the person who robbed the restaurant. After the robbery, the perpetrator carried a safe outside and then escaped in a dark-colored vehicle. This same vehicle was later identified as belonging to defendant's^girlfriend. Officers pursued the vehicle and noticed that there was only one black male inside of it. After a high speed chase, defendant leapt from the moving vehicle (which later crashed), discarded something, and then ran through the neighborhood, jumping fences. A short time later, officers found defendant hiding underneath a pool deck. A brief struggle ensued, and defendant was apprehended. Defendant told the officers he did not know who the vehicle belonged to. A gun was recovered from the scene where the vehicle crashed, and a safe and a magazine to a gun were found outside near the restaurant. Tests indicated that the gloves found in the vehicle contained defendant’s DNA. On the other hand, defendant denied robbing Braxton’s and claimed he was kidnapped.
After hearing the testimony, the jury obviously believed the state’s witnesses and rejected defendant’s story. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Rowan, 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
We find that a rational trier of fact could have found that the evidence was sufficient under the Jackson standard to support defendant’s armed robbery conviction. We further find that every reasonable hypothesis of innocence was excluded and that the state negated any reasonable probability of misidentification. Although defendant claimed he was kidnapped and that the driver told him to exit the moving vehicle, Officer Schiro saw only one person sitting in the driver’s seat of the. vehicle, and at the end of the chase, only one person was seen exiting the vehicle’s driver’s side. No other person could be located on the scene even though a perimeter was set up and a police dog was used.
|16 Although Mr. Rivas could not identify defendant’s face as the face of the person who committed the crime against them, we find the state presented sufficient evidence to link defendant to the crimes charged. See State v. Mason, 59 So.3d 419, 419 (La.App. 5 Cir.2011). Accordingly, we conclude the evidence of defendant’s identity as a perpetrator of the armed robbery negates any possibility of misidentification. Therefore, this assignment is without merit.

Assignment Two

In his second assignment of error, defendant argues the trial court erred when it deemed inadmissible, evidence from a CODIS hit. CODIS is a system of databases, supported by the FBI, which contain DNA profiles that were collected from convicted offenders and arrestees.[8] In this case, DNA taken from the hat *340 found in the crashed vehicle matched an entry in a CODIS-supported database.
At a motion hearing on July 25, 2012, the trial court heard the state’s motion to exclude evidence of the CODIS hit. The state argued that any mention of CODIS or the name of the second person, who the CODIS database matched with the DNA, should be excluded from trial. The state conceded that the fact that the DNA from the hat did not match defendant should be allowed into evidence at trial. After hearing arguments, the trial court took the matter under advisement. The trial court issued an oral ruling on this matter the same day, stating,
The Court had taken under advisement the issue with regard to the admissibility of CODIS records and/or CODIS testimony from the defense. The Court is going to at this time deny that motion with regard to the admission of any closed records in that the State’s experts will testify relative to the DNA in this matter; and that those individuals who — the person that the State is calling with reference to the testimony of the DNA was not the person who conducted the testing relative to the CODIS information; however, the Court will allow the defense to ask the DNA expert any questions with regard to the DNA test and whether the defendant was included or excluded, 117could be included or could be excluded as a donor of the sample that was tested in this matter. And the Court will note the defense’s objection to the Court’s ruling.
Trial on defendant’s charges was held the next day, July 26, 2012.
Here, the evidence shows the trial court allowed the jury to hear the fact that hair on the hat belonged to a male family member of defendant. The trial court also allowed into evidence the fact that this DNA did not belong to defendant himself.
At trial, defense counsel sought to introduce into evidence a Jefferson Parish Sheriffs Office Regional DNA Laboratory report dated April 20, 2012.[9] The report states that a search of an FBI database of DNA resulted in a match between the DNA sample from the hat and a person named “Tom Kelly Stewart.” However, the report further provides that an additional DNA specimen must be collected from Mr. Stewart to confirm this match pursuant to federal guidelines that oversee regulation of the national DNA database. The record shows that an additional DNA specimen was not collected from Stewart to confirm the match. The trial court did not allow this report into evidence. Defense counsel then proffered this evidence into the record for our review.
By excluding this evidence — the hit the CODIS database returned in connection with the DNA sample from the hat — the trial court did not permit the jury to infer that the donor of the DNA, found on the hat, was the person who committed the crime defendant was charged with committing, because that donor had committed a prior crime. In this ruling on an eviden-tiary matter, the trial court had great discretion in balancing the relevancy of the evidence against its prejudice and potential to confuse the jury. La. C.E. art. 403; State v. Duncan, 98-1730, p. 10 (La.App. 1 Cir. 6/25/99), 738 So.2d 706, 712-713. While the DNA found in |isthe hat has some relevance in that it shows that another person who committed a different crime may have worn the hat, we cannot say the trial court manifestly erred in excluding this evidence to prevent the jury from improperly concluding that this other person committed the crime at bar. See State *341 v. Guillory, 12-0702 (La.App. 1 Cir. 12/21/12), 2012 WL 6681817, writ denied, 2013-0216 (La.8/30/13), 120 So.3d 258 (finding that the trial court did not manifestly err in excluding evidence that another person committed the charged crime). Accordingly, this assignment of error is without merit.

ERRORS PATENT

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals four errors patent. Despite these errors however, the only corrective action required by this Court is to advise defendant, by way of this opinion, of the time period within which he may file an application for post-conviction relief.
First, the trial judge failed to impose the mandatory fine of not less than one thousand dollars nor more than five thousand dollars as required by La. R.S. 14:95.1(B). This Court has the authority to correct an illegal sentence at any time. La.C.Cr.P. art. 882. However, this authority is permissive rather than mandatory. In State v. Campbell, 08-1226 (La.App. 5 Cir. 5/26/09), 15 So.3d 1076, writ denied, 09-1385 (La.2/12/10), 27 So.3d 842, this Court noted the defendant’s indigent status and declined to correct an illegally lenient sentence where the district court failed to impose a mandatory fine. Here, following Campbell, due to defendant’s indigent status, we refrain from exercising our authority to correct his illegally lenient sentence.
119Second, the record in this case does not disclose that defendant was advised of his rights prior to the multiple bill hearing. This was in violation of La. R.S. 15:529.1 which requires the trial court to advise a defendant of the allegations contained in the information, his right to a hearing, and his right to remain silent. State v. Haywood, 00-1584, p. 19 (La.App. 5 Cir. 3/28/01), 783 So.2d 568, 582. While this is an error, it is harmless. The failure of the trial court to advise a defendant of his right to a trial and to remain silent is harmless error when the multiple offender status is established by competent evidence offered by the state at a hearing, rather than by the admission of the defendant. Id. Here, defendant proceeded to the multiple bill hearing, and the state presented competent evidence at the hearing to establish his multiple offender status. Therefore, we find that the trial court’s failure to advise him of the specific allegations against him and of his right to be tried and to remain silent were harmless errors.
Third, defendant was convicted on July 26, 2012. On August 23, 2012, he filed a pro se motion for appeal that was denied. In that motion, defendant sought to appeal his convictions. However, that motion was premature as defendant had not yet been sentenced. Defendant was sentenced on the underlying charges on October 18, 2012. He was subsequently found to be a fourth felony offender and resentenced as such on January 7, 2013. On January 25, 2013, he filed another timely motion for appeal that was granted. In that motion, defendant specifically stated he was appealing the final judgment rendered on January 7, 2013. Because the prematurity of defendant’s first motion for appeal was cured when defendant was sentenced, we find that the issues he has raised on appeal regarding his convictions are properly before us.
Fourth, the record indicates that defendant was given an incomplete advisal regarding the post-conviction relief period under La.C.Cr.P. art. 930.8.6. The |2ntranscript shows that after the trial *342 judge imposed the enhanced sentence, he advised defendant that he had “two years after the judgment of sentence has become final in these matters to file ... for post conviction [sic] relief.”[10] This Court has held that the failure to advise a defendant that the prescriptive period runs from the time his conviction and sentence become final is incomplete. State v. Grant, 04-341, p. 5 (La.App. 5 Cir. 10/26/04), 887 So.2d 596, 598 (emphasis as found in original).
In accordance with this Court’s routine practice, we advise defendant, by way of this opinion, that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. arts. 914 or 922. See State v. Brooks, 12-226, p. 14 (La.App. 5 Cir. 10/30/12), 103 So.3d 608, 615, writ denied, 12-2478 (La.4/19/13), 111 So.3d 1030.

CONCLUSION

For the foregoing reasons, we hereby affirm defendant’s convictions and sentences.

AFFIRMED.

. The restaurant’s surveillance video was admitted into the record as state’s exhibit 19 and was published to the jury.

. Emily Nguyen, the custodian of 911 system records for the Gretna Police Department, authenticated state’s exhibit 21 as a recording of a phone call to 911. That recording was then played for the jury. In this recording, the caller reported being robbed at 636 Franklin Street by a masked man wearing all black.

. Mr. Kennedy testified that he knew defendant was the person who robbed the restaurant that night because he could identify defendant’s voice as the voice of the person who robbed him. Upon further questioning however, Mr. Kennedy admitted that he had not heard defendant speak in court that day and that this was the first time he had seen defendant since the night of the robbery.

. While in pursuit, other police vehicles joined and eventually got in front of Officer Schiro's patrol unit. Because other officers were leading the pursuit, Officer Schiro did not see the car crash. However, Officer Schi-ro testified that he came on the scene of the car crash soon after it happened and recognized the crashed car as the car he had pursued.

. Officer Campos also testified that after defendant was apprehended, he learned that a safe and a gun magazine were found on the ground just north of Braxton’s near or on Franklin.

. Detective Richard Russ originally obtained defendant’s DNA by conducting a buccal swab on defendant. Before administering this buccal swab, Detective Russ obtained a search warrant allowing him to take this DNA.

. Although defendant assigns insufficient evidence to support his conviction as his second assignment of error, we address it first. State v. Hearold, 603 So.2d 731, 734 (La.1992) (When the issues on appeal pertain to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence.).

. See Federal Bureau of Investigation, Frequently Asked Questions (FAQs) on the CODIS Program and the National DNA Index System, http://www.foi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet (last visited October 22, 2013).

. This report was signed by a Ms. Brown and Ms. Dubourg.

. The defendant’s commitment reflects that the trial judge informed defendant that he had two years after the judgment of conviction and sentence has become final to seek post-conviction relief. This however is not reflected in the transcript. The transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).