AMY, Judge.
pThe State alleged that the defendant was involved in a series of drive-by shootings that resulted in the death of one of the victims. A jury convicted the defendant of one count of negligent homicide, two counts of attempted second degree murder, and one count of felon in possession of a firearm. After finding the defendant to be a second felony habitual offender, the trial court sentenced the defendant to ten years without the benefit of probation or suspension of sentence for the negligent homicide conviction; twenty-five years without benefit of probation or suspension of sentence for each conviction for attempted second degree murder, and fifteen years without the benefit of probation or suspension of sentence for the felon in possession of a firearm conviction. The trial court ordered that the defendant’s sentences for negligent homicide and attempted second degree murder run consecutively and that the defendant’s sentence for felon in possession of a firearm run concurrently with the other sentences. The defendant appeals. For the following reasons, we affirm with instructions.
Factual and Procedural Background
According to the record, in the late night/early morning hours of September 27-28, 2011, there was a series of drive-by shootings in Alexandria. One of those shootings resulted in the death of Joe Mar-zette and another resulted in a gunshot wound to the leg of Darryl White.[1] Thereafter, the defendant, Tedrick Jewan Richardson, was charged with one count of second degree murder, a violation of La, R.S. 14:30.1; two counts of attempted sec *345 ond degree murder, violations of La.R.S. 14:30.1 and 14:27; one count of possession of a firearm by a convicted 12felon, a violation of La.R.S. 14:95.1; one count of distribution of a counterfeit controlled dangerous substance—Schedule II, a violation of La.R.S. 40:967(A)(2); and unauthorized use of a motor vehicle, a violation of La. R.S. 14:68.4. After a trial, the jury returned a responsive verdict of guilty of negligent homicide, a violation of La.R.S. 14:32; guilty with regard to both counts of attempted second degree murder; guilty of distribution of a controlled dangerous substance—Schedule II; and not guilty of unauthorized use of a motor vehicle.
The record indicates that defendant filed a motion for post-verdict judgment of acquittal and that the trial court granted that motion in part with regard to the defendant’s conviction for distribution of a controlled dangerous substance—Schedule II. Further, the State filed a habitual offender bill, and the trial court determined that the defendant was a second felony offender.
The trial court sentenced the defendant to ten years at hard labor without benefit of probation or suspension of sentence for his conviction for negligent homicide and twenty-five years at hard labor without benefit of probation or suspension of sentence for each of the defendant’s convictions for attempted second degree murder. For his conviction for possession of a firearm by a convicted felon, the trial court ordered that the defendant serve fifteen years at hard labor without the benefit of probation or suspension of sentence. The trial court ordered that the defendant’s sentences for negligent homicide and for each conviction of attempted second degree murder run consecutively. It further ordered that his sentence for possession of a firearm by a convicted felon run concurrently with his other sentences.
The defendant appeals, asserting as error that:
|,SI. The Trial Court Erred in Denying Tedrick Richardson’s Post-Trial Motions Because there was Insufficient Evidence that he was Involved in Any of the Three Shootings.
II. Even if Tedrick Richardson’s statement is Accepted as True, Nothing in His Statement or Witness Testimony Establishes that he acted as a Principal or the Actual Perpetrator of Any of the Three Shootings.
III. The Trial Court’s Imposition of Consecutive Sentences for the Three Shootings was Excessive.
Discussion

Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent. An error patent is one which is “discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.” La. Code Crim.P. art. 920(2). On review, we note patent errors with regard to the sentences reflected in the minutes and commitment order. Namely, the trial court’s minutes from the defendant’s sentencing hearing indicates that the defendant’s sentences for negligent homicide, attempted second degree murder, and possession of a firearm by a convicted felon were imposed without the benefit of parole. However, the transcript of the hearing from the defendant’s sentencing indicates that the trial court imposed “all sentences ... at Hard Labor with no benefit of Probation or Suspension of Sentence[.]” It is well-settled that when the minutes and the transcript conflict, it is the transcript which prevails. State v. Wommack, 00-137 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, writ denied, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, we *346 instruct the trial court to correct the sentencing | ¿minutes to accurately reflect the transcript and to further correct the commitment order to reflect that these sentences were imposed as stated in the transcript.[2]

Sufficiency of the Evidence

Although phrased differently, the defendant’s first two assignments of error concern the sufficiency of the evidence. In addition to his assertion that the State presented insufficient evidence of his identity as one of the perpetrators, he suggests that consideration of the State’s evidence is undermined by its reliance on circumstantial evidence.
The standard of appellate review for sufficiency of the evidence claims is well-settled. In State v. Macon, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86, the supreme court reiterated that standard, stating:
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S, 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Mussall, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the Jackson standard of review. State v. Bordenave, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. Id.
As here, the primary issue at trial in Macon was whether the defendant was one of the perpetrators in the subject series of offenses. “[W]hen the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification.” State v. Hughes, 05-992, p. 5 (La. 11/29/06), 943 So.2d 1047, 1051. In order to support a conviction, the defendant need only be positively identified by one witness. Id.
Here, the parties dispute whether the State’s case involved purely circumstantial evidence, or whether it relied upon a combination of direct and circumstantial evidence, or whether it relied upon a combination of direct and circumstantial evidence to prove the defendant’s involvement. “Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue[.]” State v. Lilly, 468 So.2d 1154, 1158 (La.1985). Circumstantial evidence, however, “consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.” Id.
In State v. Major, 03-03522, p. 6 (La. 12/1/04), 888 So.2d 798, 801-02, the supreme court explained that:
when the conviction is based on circumstantial evidence, La. R.S. 15:438 sets forth the rule that “assuming every fact to be proved that the evidence tends to prove, in order to convict, [the circumstantial evidence] must exclude every *347 reasonable hypothesis of innocence.” However, La. R.S. 15:438 does not establish a stricter standard of review than the more general rational juror’s reasonable doubt formula; rather it serves as a helpful evidentiary guide for jurors when evaluating circumstantial evidence. State v. Toups, 01-1875, p. 3 (La.10/15/02), 833 So.2d 910, 912; State v. Chism, 436 So.2d 464, 470 (La.1983). When evaluating circumstantial evidence, the trier of fact must consider
the circumstantial evidence in light of the direct evidence, and vice versa, [and] the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.
Chism, 436 So.2d at 469.
With regard to the defendant’s conviction for negligent homicide, La.R.S. 14:32 provides, in relevant part, that “A. Negligent homicide is .... (1) The killing of a human being by criminal negligence.” Criminal negligence is defined in La.R.S. 14:12, which states that:
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
With regard to the defendant’s convictions for attempted second degree murder, La.R.S. 14:30.1 provides, in relevant part, that “[s]econd degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]” Further, attempt is defined in La.R.S. 14:27(A), which provides that:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
Thus, although La.R.S. 14:30.1 provides that second degree murder requires “specific intent to kill” or “to inflict great bodily harm,” in order to be convicted of attempted second degree murder, the State must prove that the defendant had the specific intent to kill. State of Thomas, 10-269 (La.App. 3 Cir. 10/6/10), 48 So.3d 1210, writ denied, 10-2527 (La. 4/1/11), 60 So.3d 1248, cert. denied, 565 U.S. 859, 132 S.Ct. 196, 181 L.Ed.2d 102 (2011). However, that intent may be inferred from the specific circumstances of the offense and the defendant’s conduct. Id.
With regard to the defendant’s conviction for possession of a firearm by a convicted felon, La.R.S. 14:95.1 (footnote omitted) provides that:
|7A. It is unlawful for any person who has been convicted of a crime of violence as defined in R.S. 14:2(B) which is a felony or simple burglary, burglary of a pharmacy, burglary of an inhabited dwelling, unauthorized entry of an inhabited dwelling, felony illegal use of weapons or dangerous instrumentalities, *348 manufacture or possession of a delayed action incendiary device, manufacture or possession of a bomb, or possession of a firearm while in the possession of or during the sale or distribution of a controlled dangerous substance, or any violation of the Uniform Controlled Dangerous Substances Law which is a felony, or any crime which is defined as a sex offense in R.S. 15:541, or any crime defined as an attempt to commit one of the above-enumerated offenses under the laws of this state, or who has been convicted under the laws of any other state or of the United States or of any foreign government or country of a crime which, if committed in this state, would be one of the above-enumerated crimes, to possess a firearm or carry a concealed weapon.
[[Image here]]
C. The provisions of this Section prohibiting the possession of firearms and carrying concealed weapons by persons who have been convicted of certain felonies shall not apply to any person who has not been convicted of any felony for a period of ten years from the date of completion of sentence, probation, parole, or suspension of sentence.
Therefore, the State must have proven that 1) the defendant possessed a firearm; 2) a previous conviction for an enumerated felony; 3) the ten-year cleansing period has not passed; and 4) the general intent to commit the crime. State v. Caffrey, 08-717 (La.App. 5 Cir. 5/12/09), 15 So.3d 198, writ denied, 09-1305 (La. 2/5/10), 27 So.3d 297.
With consideration of the elements of the offenses charged, and in light of the standard of review, we turn to consideration of the evidence presented at trial. State’s witness Chris Newell testified that, on September 27, 2011, he visited Alexandria to buy crack cocaine. Mr. Newell explained that he ultimately loaned his car until “about twelve or one o’clock or so” to someone named “Dedriek, Tedrick—some-thing to that [e]ffect” for about $50 worth of crack cocaine. Mr. Newell identified the defendant as the person to whom he had loaned his vehicle. |8He explained that, when his car was not returned to him later, he flagged down a police officer. Mr. Newell testified that his vehicle was a 1997 Honda Accord, silver or gray in color, and that it had a sunroof and a small spoiler. Although Mr. Newell initially testified that he thought his back windows were tinted, after looking at a picture of the vehicle presented by the State, he admitted that they did not appear to be tinted.
Addressing the timeframe of the events at issue, an employee of the Rapides Parish Communication District testified that, on September 28, 2011, at 12:24 a.m., the 9-1-1 center received a call from Mary Street reporting that someone had been shot (the Monroe incident). Additionally, at approximately 12:44 a.m., the 9-1-1 center received a call from the vicinity of Cabrini school and Texas Avenue that there was an unresponsive person lying in the street (the Texas Avenue incident).[3] Finally, at approximately 12:49 a.m., the 9-1-1 center received a “shots fired” call from Merrian Peterson on Ninth Street (the Ninth Street incident).
With regard to the Texas Avenue incident, Debra Howard testified that she was driving on Texas Avenue on September 28, at approximately 12:30 a.m. when she noticed a man lying on the side of the street near the curb. Ms. Howard testified that she thought that the man had been drinking and had fallen from his bicycle. Ms. *349 Howard, thereafter, decided to go back and see if the man was still lying there. When she returned approximately five minutes later and found the man still in the street, she asked her girlfriend to call 9-1-1. The record indicates that the body of Joe Marzette was subsequently located on Texas Avenue. The | ¡forensic pathologist testified that Mr. Marzette died from a gunshot wound and that he had recovered a small caliber projectile from. Mr. Marzette’s lung.
Although the 9-1-1 call regarding Mr. Marzette’s shooting was made at 12:44 a.m. on September 28, the State introduced the testimony of Jamarques Starling. Mr. Starling testified that in 2011 he lived on Texas Avenue across the street from Cabrini school. According to Mr. Starling, at about 11:30 to 11:45 p.m. on September 27, 2011, he heard what sounded like a BB gun being fired. Thereafter, he saw a car coming down the street from the direction of the noise. Mr. Starling testified that the car had four doors and was “probably a Buick, something old school.” Mr. Starling also stated that the car was dark black or blue, although he admitted that in his original statement he described it as light blue or gray. Mr. Starling also testified that the car had a least three passengers, and that the defendant was definitely not the driver of the car.
The State also offered the testimony of Lieutenant William Bates with the Alexandria Police Department. Lieutenant Bates testified that it was 2.4 miles from the location where Mr. Marzette was shot to the location of the Monroe Street incident, the alleged second-occurring shooting. Lieutenant Bates testified that, driving the speed limit, it took him seven minutes to drive from one location to the other.
As for the latter location, Darryl White testified that he was walking on Monroe Street after midnight on September 28, when he was shot in the ankle. According to Mr. White’s testimony, someone fired at least six shots at him from the driver’s seat of a car that was “standing still” around the intersection of Florence and Monroe. Mr. White testified that he saw the car before the shots wére fired and that “the car was coming towards my way and they made the |1flcorner.” Further, “[w]hen they made the corner, they stopped in the driveway. Then they back backed [sic] to the corner and they started shooting at me.”
Mr. White testified that there were at least four people in the car, which he said was gray, “looked like a gray Ford Es-eort[,]” and that it had tinted windows, although the tint was partially torn off one of the windows. Although Mr. White stated that the car had a spoiler on the back, he was certain that he car did not have a sunroof and that the windows were tinted. Further, Mr. White testified that the driver of the vehicle—the one who fired the shots—was “chubby” and “way, way bigger” than the defendant.
As far as the alleged third-occurring shooting that evening, the Ninth Street incident, Merrian Peterson testified that .he was standing, outside on Ninth Street when he saw “a car going from one side of the street to the other. ... after that car passed me about four or five car lengths ... someone got out and they cursing me out and the next thing I knew some bullets are flying by my head.” Mr. Peterson testified that it was the passenger who stepped from the car. Mr. Peterson further explained that he dove behind his car and stayed there until the other car drove off. After taking about ten minutes to compose himself, Mr, Peterson called the police.
Mr. Peterson admitted that he originally described the vehicle as a dark blue Nissan with tinted windows. However, in his *350 testimony he stated several times that he was not positive about the color of the car because it was “in the shadows” and that he had been drinking at the time.
As far as the defendant’s alleged involvement, Sergeant Robert Distafano with the Alexandria Police Department testified that he began interviewing the defendant at approximately 8:30 p.m. on September 28, 2011, but that Sergeant In Cedric Green took over the interview about an hour later. According to Sergeant Distafano, the defendant was picked up shortly before the interview.
The defendant’s recorded statement was played for the jury and, additionally, the transcribed statement was introduced into evidence. Therein, the defendant admitted that he gave Chris Newell drugs in exchange for the use of his vehicle. Further, the defendant stated that he and Quanta-vious “Taye” Frazier picked up Michael Dotson. The defendant claimed that the incident on Monroe Street was the first incident, and stated:
A: Okay we rode... uh at first I was the driver. And then Mike forced like made me like make him drive. Like let him drive. While he was driving we went down Chester Street at first. And then we made it to Monroe Street. We made a right on Monroe Street. We rode down. And while I was in the passenger seat we made a couple of shots. My homeboy Taye was in the backseat.
Q: Okay. He—who made a couple of shots?
A: Mike. Mike shot a couple of shots, about two or three shots.
According to the defendant, Mr. Dotson was in the driver’s seat at that time. The defendant stated that he had “never seen” the person that Mr. Dotson shot at on Monroe Street.
The transcript of-the defendant’s statement indicates that the officers next asked him about what happened on “Sixth Street.” The defendant stated that:
A: We made it off the highway, off 49 on the exit to Lower Third. We passed up Peabody. Alright we passed up Ed Payne’s store and we made a right on Sixth Street. When we made a right on Sixth Street and made it to the fork, to the fork in the road. Alright then... then Mike was like hold on, hold on, hold on before we made it down the street.
Q: Okay who was driving at that point.
A: I was driving.
112Accor ding to the defendant’s statement, Mr. Dotson “jumped out” and “walked like up—like in front of the car a lil’ bit.” The defendant claimed that at that point he noticed that Mr. Dotson had a gun. However, the defendant also stated that “well, I already knew he had a gun cause he had shot[.]” The defendant stated that once he noticed Mr. Dotson had a gun, he “smashed the gas” and made a right. According to the defendant he heard a couple of shots after Mr. Dotson got out of the car. The defendant also stated that Mr. Frazier felt that the defendant’s driving was going to get them “busted,” so he and Mr. Frazier switched seats. Mr. Frazier “made the block and picked Mike up.” The defendant later asserted that Mr. Dotson livéd “right there” and that he thought Mr. Dotson was “fixing to run in [his] house and run back out.” Further, he stated that Mr. Dotson told the defendant to “make the block.”
With regard to the shooting on Texas Avenue, the defendant stated that he was sitting in the backseat and that Mr. Dotson was driving. The defendant stated that he had been “like laying like on—like the headrest like this[.]” The statement further indicates that:
*351 A: with my hand to my head. And I just noticed Mike upping the gun out the sunroof. That’s what made me like... really come to my senses; cause I had been smoking weed. When I seen that I looked, I like tried to look to see who he was aiming the gun at, and I ain’t see nobody.
Q: Right.
A: Then I heard like three shots. Well I seen him shoot like three times you know[.] He hurried up and smashed off.
The defendant claimed that after that, they all went to McDonald’s and then, when the defendant asked Mr. Dotson what they were going to do with the car, Mr. | ^Dotson said that he had “a spot to take it” on “Eight Street on a dead end street[.j” According to the defendant, they left the car there and then he went home.
The defendant also stated that between the incidents on Monroe Street and Texas Avenue, he went home and picked up a charger for his phone. The defendant claimed that the first shooting happened at “9-8-8:30-8:45-9[.]” When asked about the time period “from the first shooting to the last shooting!,]” the defendant responded “[a]bout three hours.” He subsequently stated that: “Three or four hours at most. Cause we like Mike what is you doing man. Drop us off. Man y’all ain’t going no where. Y’all go tell. Y’all boys must go tell. That’s what he kept on saying; y’all go tell man.”
Defense counsel questioned Sergeant Distafano, Sergeant Green, and Detective David Foshee about the course of the investigation. Specifically, defense counsel questioned both Sergeant Distafano and Sergeant Green with regard to their conduct during the defendant’s interview and with regard to several people whose names were mentioned as part of the investigation, and whether the police interviewed those individuals or took their statements. With regard to Mr. Dotson, whom the defendant alleged fired the gun, Sergeant Distafano testified that he interviewed Mr. Dotson and that Mr. Dotson provided him with an alibi that he believed.
Additionally, Daniel Guillot testified that he saw the’ défendánt several times on the night of September 27, 2011. According to Mr. Guillot, after 1 a.m. on September 28, 2011, he saw the defendant at a house belonging to Sirderian Caesar’s aunt on Sixth Street and Glen Oaks. Mr. Guillot testified that when he first saw the defendant, he was wearing “a beat up small T-shirt” and was “sweaty like he had just been doing something.” Further, Mr. Guil-lot testified that the ¡^defendant had a “black and silver” handgun on his back belt loop, which he later testified was a 9mm semi-automatic. According to Mr.' Guillot, the defendant went into a bedroom and changed clothes. Mr. Guillot stated that after the defendant changed clothes he did not see the gun anymore and that the defendant stayed at the house about thirty minutes. Mr. Guillot also observed that the defendant’s grandmother lived across the street from the house.
Mr. Guillot further testified as to statements allegedly made by the defendant when they were both in a holding cell. According to Mr. Guillot, the next day both he and the defendant were picked up by the police, and the defendant was later placed in a holding cell with Mr. Guillot. Mr. Guillot explained that he overheard the defendant tell another person that “[he] busted somebody but they ain’t got nothing on me.” Mr. Guillot stated that he got to the holding cell at about 8:30 or 9:00 and that it was still daylight outside. According to Mr. Guillot, the defendant was put in the holding cell about thirty or forty minutes after Mr. Guillot’s arrival.
The State also offered the testimony of FBI Special Agent William Williams. *352 Agent Williams is part of the FBI’s Cellular Analysis Survey Team and was accepted as an expert in the field of historical cell site analysis. According to Agent Williams, whenever a cell phone user makes a network transaction, such as a phone call or text message, the cell phone company records both the time of the transaction and the location of the cell phone tower used for the transaction. Agent Williams testified that, using this historical data, it is possible to “generally locate” where a cell phone was whenever a transaction was made. However, he cautioned that it was “impossible” to pinpoint a location where the phone was at the time of any particular transaction.
|1sAgent Williams testified that he ..was asked to examine the defendant’s cell phone records for September 27, 2011, from 11:45 p.m. to 12:02 a.m.; September 28, 2011 at approximately 12:23 a.m.; and September 28, 2011, at approximately 12:53.a.m. With regard to the transactions made in close proximity to Mr. Marzette’s murder, Agent Wihi&ms testified that the defendant’s phone made several transactions at between 11:44 p.m. and 11:47 p.m. using the western-facing side of a tower located at Willow Glen and Third Street. Between 11:48 p.m. and 11:49 p.m., the defendant’s phone made several transactions using the southeastern-facing side of a tower located'near Masonic Drive and Warshauer. Between 11:49 p.m. and 11:50 p.m., the defendant’s phone made two transactions using the northeastern-facing side of a tower near Lee Street and Government Street. Agent Williams further testified that between 11:51 p.m. and 11:54 p.m., the defendant’s phone made several transactions using the southeastern-facing side of the Masonic-Warshauer tower. At 11:55 p.m., the defendant’s phone made a transaction using the southwestern-facing side of that tower. Agent Williams reiterated that he could “only tell you the general location of that phone when a call actually occurred!,]” and that he could not say where the phone was outside of any particular call.
The State offered into evidence several maps created by Agent Williams. Those maps indicated the coverage area boundaries of several tower sectors that Agent Williams identified as being used by the defendant’s phone. Agent Williams noted the distance between the Government-Lee tower and the Masonic-Warshauer tower is “less than two miles!.]” Further, Agent Williams observed that Mr. Marzette’s body was found “roughly half a block” outside of the coverage area of the tower sector used by the - defendant’s phone at 11:55 p.m.
| í fiWhen questioned by defense counsel, Agent Williams agreed that, if Mr. Mar-zette’s murder occurred between 11:30 and 11:45 p.m., as opposed to 11:45 p.m. to 12:02 a.m., he had no data for that time period. Agent Williams also agreed that in order for the phone’s general location to be recorded, there had to be some kind of transaction, such as a phone call or attempted phone call. Agent Williams testified that “[i]f a phone is just sitting idle somewhere, it’s not going to record a location.”
With regard to the transactions made in close proximity to the Monroe Street incident, Agent Williams testified that the closest time to the shooting per the Alexandria police was 12:23 a.m. Agent Williams testified that the defendant’s phone recorded several transactions at 12:21 a.m. and 12:24 a.m., using the western-facing side of a tower near the,intersection of Ninth Street and Murray. Agent Williams also created a map indicating the coverage area boundaries for the Ninth StreeL-Murray tower. Agent Williams testified that it was “approximately ... ten *353 blocks” from the tower to the location where shots were fired at Mr. White.
With regard to the transactions made in close proximity to the Ninth Street incident, Agent Williams testified that, according to the Alexandria police, Mr. Peterson was shot at 12:52 a.m. Agent Williams testified that the defendant’s phone recorded transactions between 12:45 a.m. and 12:55 p.m. using two sectors of a tower located near Willow Glen River Road and Seventh Street. The State submitted Agent Williams’ map into evidence which indicates that location of the Ninth Street shooting and the location where Mr. New-ell’s vehicle was recovered.
Additionally, the State presented testimony regarding evidence collected from the various crime scenes. With regard to the Monroe Street incident, Deputy Deidre Allen testified that she found a bullet fragment on the sidewalk and blood 117on the ground roughly where the victim told her that he had been shot. On Ninth Street, Officer Edward Scott testified that he recovered shell casings from a .380 handgun from the location where Mr. Peterson said the shooter was standing. Officer Scott also testified that he found a bullet hole in the wall of a neighbor’s residence and that a bullet was collected from the neighbor’s bathroom.
Lieutenant Bates testified that from the defendant’s residence, which he explained was three or five blocks from the location of the Ninth Street shooting, was searched but that “[n]othing of value was found at his residence.” Further, Lieutenant Bates testified that a .22 caliber bullet was recovered from Mr. Marzette’s body and that he recovered four .380 fired cartridge casings on the southwest corner of Florence and Monroe Street.
Lieutenant Bates also stated that he processed Mr. Newell’s Honda for fingerprints and that he recovered fifteen latent prints from the vehicle. According to Lieutenant Bates, a fingerprint found on the inside driver door handle was identified as belonging to the defendant. He further stated that he tested the remaining prints against the fingerprints of various individuals, but that none of those individuals’ prints matched any of the remaining unidentified prints. Lieutenant Bates also indicated that no fingerprints were found on the shell casings.
Michael Stelly, who works for the North Louisiana Crime Lab, testified with regard to the bullets—which included a bullet jacket—and shell casings recovered at the crime scene. Mr. Stelly testified that he examined the four fired .380 cartridge cases collected from the scene of the Monroe Street incident, and the two fired .380 cartridge cases collected from the scene of the Ninth Street incident. According to Mr. Stelly, he determined that all six cartridge cases were fired from|isone weapon. With regard to the bullet and the bullet jacket, Mr. Stelly testified that he could not determine whether they were fired from the same weapon because the bullet jacket was damaged, but that he could tell they were fired from a weapon with the same class characteristics. Mr. Stelly also noted that, because .380 cartridges have the same diameter but are slightly shorter than 9mm cartridges, it was possible to fire a .380 bullet from a 9mm weapon.
Mr. Stelly also testified that he examined the bullet recovered from Mr. Mar-zette’s body. According to Mr. Stelly’s testimony, that bullet was a .22 caliber bullet. Mr. Stelly testified that, because a .22 caliber bullet could not be fired out of a .380 caliber weapon, that those were “two different guns.” Mr. Stelly also observed that, because a “.22 is a small cartridge with a lot less gun powder” it has a “lot less bang, lot less noise when it exits the barrel of a gun.”
*354 With regard to the State’s burden of proving the charge of felon in possession of a firearm, the defendant stipulated that he had previously been convicted of “possession of CDS Schedule II, Cocaine, a felony on June 21, 2011.”
Following the close of the State’s case, the defendant presented various witnesses, including his mother, Olivia Richardson. Ms. Richardson testified that her son lives with her on Woodard Street. According to her testimony, the defendant, who was driving a “tannish, gold Honda” came to her house at approximately 11:45 p.m. with Quantavious Frazier. The defendant retrieved his cell phone charger and left at most five minutes later. Ms. Richardson later stated that she saw her son several times that evening—at 11:15 p.m., at approximately 11:35 p.m., and at 11:45 p.m. She testified that:
[The State] He drove up at the time in a Honda. At eleven fifteen?
[19[Ms. Richardson] Yes, sir.
Q He stayed in the house for a few minutes. Left in the Honda?
A Yes, sir.
Q Okay. Then you don’t see him again until eleven fifty?
A No. He same [sic] to the house— eleven fifty was the third time. That’s what [sic] I told him what I told him. He came the first time. He left and he came right back. That was the second time. The third time was eleven forty-five. That’s when I told him, the next time you come here you come in to stay.
Ms. Richardson also testified that the defendant returned home again at 2:30 a.m. Further, Ms. Richardson stated that she had made it clear to the defendant that she did not want any guns in the house. According to her testimony, this was because of her own felony convictions.
Misty Deleery and Breaisha Davis both testified that the defendant arrived at their house on Park Avenue starting at approximately 12:10 a.m. and stayed for over an hour. According to both Ms. De-leery and Ms. Davis, while the defendant was at their house, Ms. Deleery tried to braid his hair. Ms. Deleery stated that she remembered the time period that he was there because she took a phone off of the charger before the defendant arrived and had seen the time and that her mother later woke up and yelled at them to come back inside because it was almost 1:00 a.m, Ms. Deleery did admit that she told the police “I don’t know” when questioned about whether the defendant could have left at 12:30 a.m. When asked how the defendant left, she replied “[w]alking.” She also denied seeing a car.
Further, Ms. Davis was positive that the defendant was at her house between midnight and 1:00 a.m. However, when questioned by the State, Ms. Davis insisted that she and Ms. Deleery had been taken to the police station on the same | ándate and that she had given her statement to the police on October 1, 2011. Ms. Davis testified that she was “a hundred percent” positive that she only went to the police station one time. However, when questioned by the State as to why her statement was dated October 3, 2011, Ms. Davis testified:
[The State] Okay. And you recall the police officer said to you on October the third—
[Ms. Davis] Mm-hmm.
Q—I picked you up on Sunday and I had you come down here to the police station but you were too high for me to get a statement from you. Is that right? And what was your response on October the third?
AI said, I guess.
*355 Dantavious Lindsey testified that he was with the defendant in the early morning hours of September 28, 2011. Mr. Lindsey testified that the defendant came to get some “weed” from him at his mother’s house on Gabriel Lane. According to Mr. Lindsey, the defendant, who was in a gold Honda, arrived at “like one o’clock. Between twelve and” 1:00 a.m. Mr. Lindsey later testified that it was right after midnight. Mr. Lindsey also testified that Da-vetreous “Boomer” Howard was already in the vehicle with the defendant. Mr. Lindsey denied seeing a gun or ammunition in the vehicle and denied seeing the defendant with a gun.
According to Mr. Lindsey’s testimony, they dropped Mr. Howard off on Tulane Avenue and then went to go pick up Travi-us “Cat” Warden from his grandmother’s house, which was also on Tulane Avenue. Mr. Lindsey testified as follows:
[The defendant’s attorney] When Cat got into the vehicle—when Travius Warden got in the vehicle, did he have any firearms?
[Mr. Lindsey] No, sir.
|WQ And during the period of time y’all were in the car, did he shoot at anybody?
A No, sir.
Q Did you even have a gun on you?
A No, sir.
Q Did Tedrick shoot anyone?
A No, sir.
Q No shooting?
A No, sir. And no one shooting.
Mr. Lindsey further testified that after they picked up Mr. Warden, they all went to the BP station on Lee Street to get some cigars. Mr. Lindsey denied going to Sirderian Caesar’s house or seeing Daniel Guillot. Mr. Lindsey also stated that they went to the defendant’s house sometime after midnight to charge the defendant’s cell phone.
Davetreous Howard also testified. Mr. Howard stated that everyone calls him “Boomer.” According to Mr. Howard’s testimony, the defendant was getting his hair done on Park Avenue at 12:45 or 1:00 a.m. when Mr. Howard walked up and asked the defendant for a ride. Mr. Howard stated that they stayed at the house on Park Avenue for thirty to forty-five minutes. However, Mr. Howard later stated that he was already at the house on Park Avenue charging his phone when the defendant walked up. Mr. Howard remembered that the defendant had a brown Honda, and that defendant dropped him off in Phoenix Point. Mr. Howard denied seeing the defendant with a gun and denied shooting at anyone.
Travius Warden, who explained that everyone calls him “Cat,” testified that he was on his bicycle when he saw the defendant driving a tan Honda. Mr. ^Warden stated that the defendant was with Mr. Lindsey, whom he called “Lil’ Dan,” at that time. According to Mr. Warden, the defendant came back and picked him up between midnight and 1:00 a.m. Mr. Warden testified as follows:
[The defendant’s attorney] Okay. All right. When you got in the back of the vehicle, did you see Tedrick with a gun?
[Mr. Warden] No.
Q Did you see Lil’ Dan with a gun?
A No. I ain’t seen no guns.
Q Did you see any guns in the vehicle at all?
A No, sir. No, sir.
Q Did you see any bullets in the vehicle?
A No, sir.
Q Any ammunition in the vehicle?
A No, sir.
*356 Mr. Warden also testified that they went to the BP station to get some cigars. According to his testimony, eventually they ended up going to the defendant’s house and sat outside in the car talking until at least 4:00 a.m. Mr. Warden admitted that in his first statement he said that they stayed outside talking until 2:30 a.m. Mr. Warden further denied seeing Sirderian Caesar or Daniel Guillot.
Sirderian Caesar testified that his cousin lives on the corner of Sixth and Green Oaks. Mr. Caesar denied being at his cousin’s house at 1:00 a.m. on the morning of September 28, 2011. Mr. Caesar further stated that his cousin does not allow people to “smoke weed” at her house and does not allow people to be there late at night. Shedrick Metoyer testified that he was not at Sirderian Caesar’s | chouse at 1:00 a.m. on the morning of September 28, 2011, and eonffrmed that if Mr. Guillot said that he saw him there “[tjhen it’s all a lie.”
With regard to the defendant’s convictions for negligent homicide and attempted second degree murder, and having viewed this evidence in the light most favorable to the prosecution, we conclude that there is sufficient evidence to support these convictions. Notably, the defendant did not contest that he was in Mr. Newell’s car on the night in question. Instead, he referenced various inconsistencies in his own statement, along with that of other witnesses, to suggest that the person he named as the shooter in his statement was not in the vehicle. However, there was sufficient evidence that the jury could have determined both that Mr. Newell’s ear was the one used in all three shootings and that the defendant was in Mr. Newell’s car at the time of the shootings. Most importantly, the defendant’s statement, which was played for the jury, admitted both of these facts. The defendant’s fingerprints were also located on the driver’s door handle of Mr. Newell’s vehicle.
Certainly, there were notable inconsistencies between the witnesses’ testimonies with regard to the time of each shooting and the description of the vehicle. We observe that Mr. Guillot’s testimony about when he encountered the defendant in the holding cell was inconsistent with the officer’s testimony about when the defendant was booked. Similarly, the defendant’s alibi witnesses offered inconsistent statements about when they encountered the defendant on the night in question and those witnesses’ testimonies contradicted the defendant’s statement to the police that he was involved. However, the jury, as the trier of fact, could accept or reject, in whole or in part, the testimony of any witness, and it was within the jury’s purview to resolve those inconsistencies. Macon, 957 So.2d 1280. We note that, if accepted by the jury, there was sufficient evidence to place the defendant’s cell phone in the general area of each shooting at the approximate time of each incident. Further, there was testimony that the defendant was seen with a 9mm semi-automatic, which, testimony revealed, was capable of firing the .380 caliber cartridges recovered at two of the crime scenes.
However, the defendant’s mere presence in the vehicle at the time of the shooting does not necessarily impose criminal liability. Having concluded that there is sufficient evidence to support a conclusion that the defendant was in Mr. New-ell’s vehicle at the time of the shootings, the relevant determination is whether there is sufficient evidence to conclude that he was a principal to the crimes for which he was convicted. Louisiana Revised Statutes 14:24 addresses the law of principals, stating “[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly *357 commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.” In State v. Mason, 10-28, p. 9 (La.App. 5 Cir. 1/11/11), 59 So.3d 419, 425-26, writ denied, 11-306 (La. 6/24/11), 64 So.3d 216, the fifth circuit explained accomplice liability, stating:
Only those persons who “knowingly participate in planning or execution of a crime” are principals to that crime. State v. King, 06-554, pp. 7-8 (La.App. 5 Cir. 1/16/07), 951 So.2d 384, 390, writ denied, 07-0371 (La.5/4/07), 956 So.2d 600 (quotation omitted). An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. King, supra. The mental state of one defendant may not be imputed to another defendant. Thus, mere presence at the scene of a crime does not make one a principal to the crime. Id. However, it is sufficient encouragement that the accomplice is standing by at the crime scene ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice’s intention. State v. Anderson, 97-1301, p. 3 (La.2/6/98), 707 So.2d 1223, 1225 (per curiam) (quotation omitted).
| ^However, a “general principle of accesso-rial liability” is that “when two or more persons embark on a concerted course of action, each person becomes responsible for not only his own acts but also for the acts of the other, including ‘deviations from the common plan which are the foreseeable consequences of carrying out the plan.’ ” State v. Acker, 12-1116, p. 12 (La. App. 3 Cir. 4/3/13), 111 So.3d 535, 546 (quoting State v. Smith, 07-2028 (La. 10/20/09), 23 So.3d 291).
Having reviewed the record in the light most favorable to the prosecution, we conclude that there is sufficient evidence to support such a conclusion. Although the defendant denied firing the gun, in his statement he admitted that he was in the vehicle on three occasions when another person shot out of the car. With regard to the Monroe Street incident, the defendant’s statement indicates that he knew that another person, who he alleged to be Mr. Dotson, was shooting at a person. The crime of attempted second degree murder requires that the defendant have the specific intent to kill. See Thomas, 48 So.3d 1210. Specific intent may be established by circumstantial evidence and “[i]t is well-settled that the act of pointing a gun at a person and firing the gun is an indication of the intent to kill that person.” Id. at 1215. Similarly, the jury could have concluded that the defendant agreed to render aid to the shooter by agreeing to “make the block” and then following through on that action even after he heard gunshots.
Further, our courts have determined that where a defendant is present for multiple criminal acts and remains with the person or persons committing the criminal acts, the defendant’s intent to participate can be inferred from his continued presence. Acker, 111 So.3d 535 (citing State v. Scroggins, 40,746 (La.App. 2 Cir. 3/22/06), 926 So.2d 64, writ denied, 06-098 (La. 11/3/06), 940 So.2d 655). Accordingly, although the defendant’s statement may be interpreted R^as downplaying his involvement in the alleged offenses, there was sufficient evidence for the jury to infer that the defendant had the opportunity to leave the group but chose not to do so. In turn, the jury could have also inferred that the defendant possessed the requisite criminal intent for each of the homicide convictions. As to the negligent homicide conviction, we conclude that the jury could have found that the defendant was criminally negligent as “[t]he evidence supports a finding that the circumstances indicate *358 that the [defendant], in the ordinary-course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.” Scroggins, 926 So.2d at 69. Additionally, the nature of those circumstances supports a finding of a specific intent to kill, as is required for each of the convictions for second degree murder. Specifically, La.R.S. 14:10(1) explains, that “specific criminal intent” “exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences of his act or failure to act.”
The defendant also argues that his statement to the police was an admission and not a confession. Thus, the defendant argues, the only evidence available for the jury to consider was circumstantial evidence, and the State failed to exclude every reasonable hypothesis of innocence as required by La.R.S. 15:438.
“The term “admission” is applied to those matters of fact which do not involve criminal intent; the term “confession” is applied only to an admission of inculpatory facts and a confession of guilt.” State v. Marr, 626 So.2d 40, 45 (La.App. 1 Cir. 1993)(quoting State v. Jones, 451 So.2d 35 (La.App. 2 Cir.), writ denied, 456 So.2d 171 (La.1984)), writ denied, 93-2806 (La. 1/7/14), 631 So.2d 455. In State v. Boothe, 532 So.2d 203, 206 (La.App. 3 Cir. 1988), a panel of this court explained that there are three categories of incriminating statements:
The first category is the confession which admits the guilt of the crime charged. The second is the admission which involves the existence of criminal intent. The third is the admission or acknowledgment of facts which tend to establish guilt, but which do not involve the existence of criminal intent. The Court concluded that remarks which were not express admissions of guilt or facts showing criminal intent can be introduced without the foundation necessary for admitting a confession, despite the fact that the statements might be considered inculpatory.
In this context, the distinction between a confession and an admission is that a confession is considered direct evidence while an admission is considered circumstantial evidence. State v. Hunter, 39,664 (La.App. 2 Cir. 6/29/05), 907 So.2d 200, writ denied, 05-2027 (La. 3/10/06), 925 So.2d 507.
Here, we conclude that whether or not the defendant’s statement constitutes an admission, a confession, or a combination of both, there was sufficient evidence to support the defendant’s convictions for negligent homicide and attempted second degree murder. As stated in Major, 888 So.2d at 801, La.R.S. 15:438 “does not establish a stricter standard of review than the more general rational juror’s reasonable doubt formula[.]” As previously discussed, we conclude that the evidence and testimony, including the defendant’s own statement, contains enough information to support the jury’s finding that the defendant was a willing participant. See Scroggins, 926 So.2d 64.
Accordingly, we find that there was sufficient evidence to support the defendant’s convictions for negligent homicide and attempted second degree murder.
We further find that the State presented sufficient evidence to support the defendant’s conviction for possession of a firearm by a convicted felon. Notably, IssMr. Guillot testified that he saw the defendant with a firearm on his back belt loop. Mr. Guillot’s testimony was sufficient such that, if believed by the jury, they could have concluded that the defendant possessed the intent to possess a firearm. Further, the defendant stipulated that he *359 had been convicted of “possession of CDS Schedule II, Cocaine, a felony on June 21, 2011.” That date is within the ten-year cleansing period described by La.R.S. 14:95.1. Accordingly, we conclude that there was sufficient evidence to support the defendant’s conviction for possession of a firearm by a convicted felon.
In sum, the defendant’s assignments of error with regard to the sufficiency of the evidence are without merit.

Sentencing

The defendant also asserts that his sentences were unconstitutionally excessive. Specifically, the defendant contends that the imposition of consecutive sentences for the convictions of negligent homicide and two counts of attempted second degree murder rendered his sentences excessive.
The law with regard to excessive sentences is well-settled. In State v. Barling, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, writ denied, 01-838 (La. 2/1/02), 808 So.2d 331, this court explained that:
La. Const, art. I, § 20 guarantees that, “[n]o law shall subject any person to cruel or unusual punishment.” To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. State v. Campbell, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. State v. Etienne, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, writ denied, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing Indiscretion, not whether another sentence might have been more appropriate. State v. Cook, 95-2784 (La.5/31/96); 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
Further, in State v. Smith, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, writ denied, 03-562 (La. 5/30/03), 845 So.2d 1061, the supreme court elaborated that:
In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. State v. Smith, 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, “it is well settled that sentences must be individualized to the particular offender and to the particular offense committed.” State v. Batiste, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge “remains in the best position to assess the aggravating and mitigating circumstances presented by each case.” State v. Cook, 95-2784 (La.5/31/96); 674 So.2d 957, 958.
Additionally, La.Code Crim.P. art. 894.1 contains a list of sentencing guidelines, and the trial court must “state for the record the considerations taken into account and the factual basis therefor in imposing sentence.” La.Code Crim.P. art. 894.1(C). However, the trial court need not articulate every circumstance or read *360 through a checklist in order to comply with La.Code Crim.P. art. 894.1(C). State v. Herbert, 12-228 (La.App. 3 Cir. 6/13/12), 94 So.3d 916, writ denied, 12-1641 (La. 2/8/13), 108 So.3d 78. Yet, the record should sufficiently establish that the trial court adequately considered Article 894.1’s guidelines in imposing a defendant’s sentence. Id.
With regard to concurrent and consecutive sentences, La.Code Crim.P. art. 883 states that:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme orJj¡plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.
Accordingly, concurrent sentences are preferred when a defendant’s offenses arise from a common scheme or plan. State v. Bethley, 12-853 (La.App. 3 Cir. 2/6/13), 107 So.3d 841. It is, however, within the trial court’s discretion to impose consecutive sentences provided that the trial court articulates particular justification for doing so at sentencing. Id. “The factors to consider when imposing consecutive sentences include defendant’s criminal record, the severity or violent nature of the offenses, or the danger the defendant poses to the public.” Id. at 850 (quoting State v. Wallace, 11-1258 (La.App. 3 Cir. 5/30/12), 92 So.3d 592, writ denied, 12-1861 (La. 3/8/13), 109 So.3d 355, writ denied, 12-1865 (La. 3/8/13), 109 So.3d 355.
As for negligent homicide, La.R.S. 14:32(C) provides that “whoever commits the crime of negligent homicide shall be imprisoned with or without hard labor for not more than five years, fined not more than five thousand dollars, or both.” Further, and with regard to the two convictions for attempted second degree murder, a violation of La,R.S. 14:30.1 and La.R.S. 14:27, those offenses were punishable by ten to fifty years at hard labor, without benefit of probation, parole, or suspension of sentence. See also State v. Thomas, 10-806 (La.App. 3 Cir. 4/27/11), 63 So.3d 343, writ denied, 11-0963 (La. 10/21/11), 73 So.3d 382. Finally, La.R.S. 14:95.1, relative to possession of a firearm by a convicted felon, provides that “[wjhoever is found guilty of violating the provisions of this Section shall be imprisoned at hard labor for not less than ten nor more than twenty years |31 without the benefit of probation, parole, or suspension of sentences and be fined not less than one thousand dollars nor more than five thousand dollars.” However, these sentences must be viewed within the context of La.R.S. 15:529.1[4] as *361 the defendant was found to be a second felony habitual offender and, thus, under these circumstances each sentence could not have been “less than one-half the longest term and not more than twice the longest term prescribed for a first conviction.”
Reference to the sentences indicates that the trial court stayed within the above framework as, upon the determination that the defendant was a second felony habitual offender, it sentenced the defendant to ten years without the benefit of probation or suspension of sentence for his negligent homicide conviction; twenty-five years without benefit of probation or suspension of sentence for each conviction for attempted second degree murder; and fifteen years without the benefit of probation or suspension of sentence for the felon in possession of a firearm conviction. Accordingly, we conclude that all of the defendant’s sentences are within the statutory range.
Further, our review of the transcript from the defendant’s sentencing hearing indicates that the trial court gave lengthy reasons for the sentences, noting the presence of limited mitigating circumstances, the random, “egregious” nature of |agthe crimes, and the lack of motivation in choosing the victims. The trial court further remarked upon a lack of remorse demonstrated by the defendant. Thus, we also conclude that the trial court adequately considered the sentencing guidelines of La. Code CrimJP.art. 894.1.
Addressing the defendant’s particular concern regarding the consecutive nature of the sentences, we note that the trial court explained that:
The final issue before the Court is to determine whether the sentences imposed should run concurrently or consecutively with each other. The Court is aware of the option and so today I find that they are consecutive. The evidence, well to an extent. The evidence clearly established 3 separate occurrences in this case. Defendant shot the first victim, drove to another part of town looking for a second innocent victim, shot him, drove around some more to find a third innocent victim, shot at him. Fortunately the last bullet didn’t meet its target and Mr. Petersen was unharmed. Obviously each of these shootings amounted to a separate crime with separate intent to harm by the defendant. To run the sentences concurrent for these 3 convictions in this case would be to minimize the seriousness of each separate offense. Defendant would essentially benefit from the fact that he chose 3 and not just 1 victim.
On review, we find that the trial court adequately considered the factors, necessary to justify the imposition of consecutive sentences. In addition to the above excerpt which addresses the separate temporal element of each event, the trial court considered the defendant’s previous history, including the fact that the defendant was on probation at the time of these offenses; the gravity of the offense; the “significant, permanent injury” done to the victims; and the risk to the general public posed by the defendant. The trial court specifically noted in that regard that the defendant’s offenses appeared to be “some kind of random game[.]” Thus, we conclude that the trial court adequately expressed its reasons for imposing consecutive sentences,
lasFinally, we point out that the supreme court has admonished “that sentence review under the Louisiana constitution does not provide an appellate court with a vehicle for substituting its judgment for that of a trial judge as to what punishment is more appropriate in a given case.” State v. Mouton, 15-287, p. 15 (La.App. 3 Cir. *362 10/7/15), 175 So.3d 1122, 1133 (quoting State v. Savoy, 11-1174 (La. 7/2/12), 93 So.3d 1279). With that precept in mind, and considering the reasons given by the trial court, we find that the defendant’s sentences are not constitutionally excessive.
This assignment of error is without merit.
DECREE
For the foregoing reasons, the convictions and sentences of the defendant, Ted-rick Jewan Richardson, for negligent homicide, attempted second degree murder, and possession of a firearm by a convicted felon are affirmed. The trial couit is instructed to correct the minutes and the commitment order to reflect the transcript as to the imposition of sentences without a parole restriction.
AFFIRMED WITH INSTRUCTIONS.

. The record contains several inconsistencies in the spelling of the names of various parties. Unless otherwise noted, we use the spellings contained in the transcript of the trial.

. The commitment order presently provides that: "Defendant is given 60 years without benefit of probation, parole, or suspension of sentence.”

. While the Texas Avenue incident was the second reported, the State asserted that it occurred prior to both the Monroe Street and Ninth Street incidents.

. In particular, Louisiana Revised Statutes 15:529,1 provides, in pertinent part, that:
A. Any person who, after having been convicted within this state of a felony, or who, after having been convicted under the laws of any other state or of the United States, or any foreign government of a crime which, if committed in this state would be a felony, thereafter commits any subsequent felony within this state, upon conviction of said felony, shall be punished as follows:
(1) If the second felony is such that upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then the sentence to imprisonment shall be for a determinate term not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction. (Emphasis added).